State v. Evans.

## THE STATE v. EVANS, Appellant.

### Division Two, March 12, 1901.

1. **Jury:** CHALLENGE FOR CAUSE: INSUFFICIENT. Challenging a juror for cause is insufficient, unless the ground of the challenge is distinctly specified.

2. **Officer:** AUTHORITY TO MAKE ARREST. Revised Statutes 1899, sections 5784 and 5788, authorizing policemen in cities to make arrests without process for offenses against the city committed in their presence, do not limit their authority at common law to make arrests without process for crimes against the State; and if a police officer has reasonable cause to suspect that a person apprehended for a felony is guilty, and the prisoner kills the officer in his attempt to escape, such killing is murder.

3. ———: ———: POLICEMAN: LEGISLATIVE RECOGNITION. Legislative recognition of the existence of a certain status or power or authority, is equivalent, in point af law, to prior authorization. So that, inasmuch as sections 2468 and 8848, Revised Statutes 1899, have recognized policemen as proper persons to make arrests for State crimes, such legislative recognition is tantamount to prior authorization, and of equal force and effect.

4. ———: ARREST WITHOUT PROCESS: RESISTANCE. A person arrested without process by policemen, who are known to him and clothed in their official uniform, can not justify resistance and the killing of one of them on the ground that he had no notice of their official character.

5. **Arrest for Felony:** PRESUMPTION OF LAW: RESISTANCE UNJUSTIFIED. A person apprehended for a past felony on a fresh pursuit is presumed to know the cause of his arrest, and can not justify resistance and the killing of the officer making the arrest on the ground that he had no notice of the charge against him.

6. ———: KILLING OF OFFICER: MURDER. Where an officer, having knowledge of a past felony and of the one who committed it, arrests the offender without process, the killing of the officer by the prisoner while resisting arrest is murder in the first degree.

7. ———: ———: ———: REASONABLE SUSPICION OF FELONY COMMITTED. Where an officer arrests a person for a felony without process on a reasonable suspicion, the killing of the officer by the prisoner while attempting to escape is murder in the first degree, though no felony has been committed.

Appeal from Cooper Circuit Court.—*Hon. Geo. F. Longan,* Special Judge.

AFFIRMED.

*C. D. Corum* and *W. G. Pendleton* for appellant.

(1)   Apperson and George were both disqualified as jurors, having formed an opinion from reading the testimony of the witnesses at the coroner's inquest. State v. Culler, 82 Mo. 623; State v. Hultz, 106 Mo. 53; State v. Robinson, 117 Mo. 649; State v. Foley, 144 Mo. 600.   (2)   That the objection was not made more specific is immaterial in this case.   The object of specification is to apprise the court of the ground of objection.   The cross-examination of these jurors and the participation of the court in this examination, upon the sole question of their having formed an opinion from reading the evidence, shows that the court understood the ground of this objection.   (3)   The powers of a policeman of a city of the third class, in the matter of making arrests, are "clearly defined by statute."   R. S. 1899, secs. 5784, 5788; State v. Holcomb, 86 Mo. 379.   Being thus defined, and limited to arrests for violations of the laws of the city, the council could not by ordinance enlarge that power, is attempted by section 4 of ordinance 19.   Cooley on Const. Lim., secs. 198, 199; State v. Holcomb, 86 Mo. 379; 1 Dillon on Mun. Corp., sec. 317.   Furthermore, the power conferred by said ordinance to arrest "felons" is confined to "such persons who may be seen by him committing or attempting to commit any felony." Hennicke did not see the attempt in this case.   Constables and sheriffs, being officers of the state, may arrest on reasonable suspicion, upon information of others, that a felony has been committed and that the party arrested committed it.   Po-

State v. Evans.

licemen of cities having no jurisdiction in matters of felony nor especially authorized by state law, have not this right.    State v. Underwood, 237; State v. Holcomb, supra.    The authority of such a policeman to arrest upon information for a past felony stands upon the same footing as that of a private person.    A private person may arrest upon information one whom he has good cause to suspect of having committed a felony, if a felony has in fact been committed.    State v. Albright, 144 Mo. 638; State v. Julian, 25 Mo. App. 133; Brooks v. Commonwealth, (Penn.) 100 Am. Dec. 645.    (4)    Defendant's resistance was not unlawful if he was not told and did not know the cause of his arrest.    It is admitted that he was not told or informed by the policemen.    Although he demanded of them the cause, they expressly refused to tell him.    Did he otherwise know? Not unless he in fact entered the cigar store, and the fact shall be held to imply notice.    There was no other evidence whatever from which to infer notice.    The official character of his captors imparted no notice.    Acting within their powers as policemen they could only arrest with a warrant from the police judge, or without warrant only in case the offense was committed in their presence, and in either case only for violations of city ordinances.    R. S. 1899, secs. 5784, 5788. Even an officer acting within his proper jurisdiction, and under a warrant, must make known his authority if demanded.    "A party who is called upon by an officer to yield himself a prisoner, may demand that the warrant be read or that he be informed of the contents thereof."    Drennen v. People, 10 Mich. 169; State v. Green, 66 Mo. 650; Commonwealth v. Cooley, 6 Gray, 350.    "Not only is it essential to the rights of the citizen that he shall be required to submit to arrest only when the official character of the demand is made known to him, but it is essential to the dignity of the State that its servants should

Vol 161 mo—7

be sheltered by these official prerogatives only when they are acting legally and give notice that they so act." State v. Grant, 76 Mo. 247. "Officers not commonly known as such, officers acting outside of their proper jurisdiction, and private persons, must show their warrants when demand is made by the person arrested; otherwise a resistance will be justified." 2 Am. and Eng. Ency. of Law (2 Ed.), p. 842. All of the authorities agree that a private person making an arrest for a past felony upon information must give notice that he arrests for the felony, unless the party arrested have notice *aliunde*. State v. Albright, 144 Mo. 649; Brooks v. Commonwealth (Penn.) 100 Am. Dec. 645; In re Henry, 29 How Pr. 185. (5) Not only was the defendant entitled to have the question of notice to him of the ground of his arrest clearly and unambiguously submitted to the jury, but he was entitled to have it so stated as well in instructions drawn upon the theory and evidence of the defense as upon the theory and evidence of the State. The defendant denied that he entered the cigar store as testified to by witnesses for the State. If his testimony is true, there is not a semblance of evidence that he knew for what he was being arrested. Killing in resisting illegal arrest, in the absence of express malice, is not murder, but manslaughter. Drennen v. People, 10 Mich. 169; Roberts v. State, 14 Mo. 138; 1 Russell on Crimes (9 Am. Ed.), 799. Defendant asked an instruction on manslaughter but it was refused. Even if this instruction was improperly framed, it was the duty of the court to frame and give the proper one. State v. Matthews, 20 Mo. 55; State v. Jones, 61 Mo. 232; State v. Kilgore, 70 Mo. 546; State v. Lowe, 93 Mo. 547; State v. Hickam, 95 Mo. 332; State v. Clark, 147 Mo. 20. (6) Submission, if it be held that defendant submitted to the arrest, was no waiver of his right to resist. Robertson v. State, 53 Ark. 516; Alford v. State, 8 Tex. App. 545.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1)   Defendant did not state specifically his reasons for the challenge.   This must be done.   The particular cause must be set forth.   Elliott's Gen. Prac., sec. 530; State v. Taylor, 134 Mo. 109.   (2)   While it is ordinarily true, arrests are not lawful unless upon a warrant therefor, yet there are many cases in which the requirement of a warrant would so obstruct the effectual enforcement of the penal law, that the ends of justice would be defeated.   In certain cases and for reasons of public policy, the citizen is subjected to the further liability of being arrested by a police officer or private individual without a warrant.   Tiedeman's Law of Pol. Powers, sec. 33; State v. Holmes, 48 N. H. 377.   Defendant insists that deceased, being only a police officer of the city of Boonville, had no authority to arrest him for anything except an offense against the city ordinances.   As a general proposition that may be true, but under the circumstances of this case the deceased had a perfect right to make the arrest.   "An officer may lawfully arrest, without a warrant, one whom he has reasonable ground to suspect of having committed a felony, even though, in point of fact, the one arrested is altogether innocent, and no felony has been committed by any one."   2 Am. and Eng. Ency. of Law (2 Ed.), 870; Beckwith v. Philby, 6 B. and C. 635; Davis v. Russell, 2 M. and P. 590; 2 Hale, P. C. secs. 85 and 86; Brooks v. Commonwealth, 61 Pa. St. 352; McCarthy v. DeArmit, 99 Pa. St. 63; Holly v. Mix, 3 Wend. 353.   (3)   The defendant well knew what felony he had committed.   His crime was well in his mind.   He was acquainted with the officers and had no right to resist.   (4) Defendant well understood that he was being arrested.   He knew the officer well, was conscious of having committed a

felony but a short time theretofore, and was fully aware of his duty to submit. He did not deny entering the Bernard store; that fact stands admitted. It is not necessary to tell the prisoner why he is being arrested, if the facts and circumstances are such that he may necessarily know the reason for the apprehension. Rex v. Howorth, 1 Mov. C. C. 207. In case of an arrest without a warrant, an officer empowered by law to make such arrest is not required to give the party he is about to arrest a notice that he is going to make it, before the arrest is actually made. Shovlin v. Com., 106 Pa. St. 369. When the circumstances disclose the officer's purpose, resistance will be illegal. Lewis v. State, 3 Head 147. Where a party is apprehended in the actual commission of an offense or upon fresh pursuit thereafter, he will be held to know the reason why he is apprehended, and notice of the officer's character and intention is not, therefore, necessary. Rex v. Howorth, 1 Mov. C. C. 207; Rex v. Hunt, 1 Mov. C. C. 93; State v. Roberts, 14 Mo. 138. It is universally held that notice of the charge and intention to make the arrest may be shown by some incidental matter. Gordon's Case, 1 East P. C. 315. (5) The court has frequently held that an incorrect instruction on a lower grade of homicide than that of which the defendant was convicted is harmless error. State v. Turlington, 102 Mo. 642; State v. Bulcher, 103 Mo. 203. The defendant should not be allowed to complain as to an instruction upon a grade of homicide of which he was not convicted, even though the instruction be erroneous. State v. Dunn, 80 Mo. 681; State v. Smith, 80 Mo. 516; State v. Talbot, 73 Mo. 347.

SHERWOOD, P. J.—For the murder of William L. Hennicke, a policeman of Boonville, by shooting him with a pistol, defendant, a negro, was put upon his trial, which re-

sulted in a verdict of guilty of murder in the first degree; judgment and sentence accordingly.

The homicide happened on this wise: A number of business houses in Boonville had been burglarized during the month of March of last year, which closed the nineteenth century, nor did the burglars neglect the cigar store of Louis Bernard; it had been burglarized three or four times in succession, the last time the night before, and the cash drawer each time depleted of its funds. On the night of the twenty-sixth of the month mentioned, John Bernard, the brother of Louis, remained at the cigar store of the latter, and with Henry Winklemeyer, kept watch for the burglarious thief. He came about 10 o'clock and stopped at the front door two or three times for a moment, but seemed frightened away by passers-by, but finally, after the lapse of a few minutes, went up the steps, unlocked the door with a false key, walked away, came back, opened the door, walked in, leaving the door open about two inches; stood at the door holding the latch, when he seemed to take alarm from persons passing by, and was about to go out again, when Winklemeyer halloed to him to throw up his hands, whereupon defendant ran out through the door, closing it behind him. Winklemeyer and Bernard followed in close pursuit, and seeing defendant in front of Dan's drug-store, Winklemeyer shot at him once, when he disappeared. Thereupon, Bernard returned to the cigar store, closed it, and started home, when officers Hennicke and Jones called to him across the street, asking him if he could recognize the burglar, when he replied he could; that it was "Jocko," and on being asked which one, answered "the one that used to be on the bus a good deal." Bernard knew the negro well, and had known him for three or four years; and the light was such in the cigar store from neighboring establishments, as to render recognition by Bernard of defendant, when in the cigar store, easy.

Winklemeyer, who was twelve feet from defendant when in the cigar store, though he had never known him before, had no difficulty in subsequently identifying him as the same man he had seen enter the cigar store. When Bernard was accosted by the police officers as aforesaid, it was about 10:15 to 10:20 p. m. Hennicke then said to Bernard: "Well, I have some other stores to watch to-night, but we ought to catch him, and so I will go down to-night, I know where he stays." He says, "We will go down." So officer Jones and Hennicke and Knack and myself, went down.

"Q. Adolph Knack? A. Yes, sir. * * * * *

"Q. Where did you go? A. We went down to the house this side of the track, the old 'Sandrock' house, they call it.

"Q. You speak of the Missouri Pacific track? A. Yes, sir.

"Q. Where is that house situate with reference to the Missouri Pacific track—with reference to the depot? A. It is south of the track.

"Q. Just across the street is it? A. Yes, sir, just across the street.

"Q. Now what occurred there? A. Why, we went down there and the officers knocked on the door. The woman didn't want to let them in at first. She said she was in bed. So they told her they were looking for some one, to get up. She finally got up and opened the door and the officers went in.

"Q. Where were you at that time? A. I was standing out in front of the house, or steps. And as they were coming out, why, Evans came around between that hallway—there is a hallway between the two houses—him and some more young fellows and some women. And he stepped upon the step, and the officers came out; they put their hand on him,

and I says, 'that is the man.'   And he said to the officers, 'I didn't do anything.'   Hennicke says, 'You will find out about it in the morning.'

"Q.   Well, they arrested him there did they?   A. Yes, sir, he went, too, along with them.   They walked down as far as the track and went over to the Missouri Pacific depot and come up on the other side.

"Q.   Now which side of that street would that be?   A. That would be on the north side of the street.

"Q.   As they went up the street how were they walking with reference to each other?   A. Evans was in the middle between the two officers.   Hennicke was on the north side of him, and Jones on the south side.

"Q.   Well?   A. Well, as they got in front of Deck's property down there, why, Evans had a deck of cards in his hands.   And he said to Jones, 'Take these cards.'   Handed them to Jones; Jones put them in his pocket.   As he did, Evans jerked down his arm as if to get into his pocket or something.   Jones says, 'No, you don't.'   And then they began tussling.

"Q.   Where is that Deck property with reference to the Missouri Pacific depot?   A. It is east.

"Q. Well, how many doors?   A. Why, it is, I guess, one hundred and fifty feet from the depot.

"Q.   This occurred about that far then from the depot? A. Yes, sir.

"'Q.   Which hand, if you remember, was the deck of cards in?   A. Why, it was in this hand, the right hand.

"Q.   Well?   A. And they began tussling, and Evans pulled them into the alley.

"Q.   How does the alley run there, Mr. Bernard?   A. Runs north and south.

"Q.   Crosses Morgan street right there?   A. Yes, sir.

And they tussled up into the alley about fifteen feet and be-
gan tussling there against the fence, and swayed back, and
finally a flash and a shot fired toward Jones, and a flash and
the report was to Hennicke.   But the first report was louder
than the second report.

"Q.   At this time where were you?   A. I was standing
at the mouth of the alley facing them.

"Q.   They were, I understand, about fifteen feet in the
alley perhaps?   A. Yes, sir. * * * * *

"Q.   From where you stood could you see the direction
of these flashes?   A. Yes, sir.

"Q.   The first one went which way?   A. Towards offi-
cer Jones, and the other went towards officer Hennicke.

"Q.   The first then was towards the south was it?   A.
Yes, sir.

"Q.   And the second towards the north?   A. Towards
the north, yes, sir.

"Q.   Well, did you hear any other shots fired there, Mr.
Bernard?   A. No, sir, just these two.

"Q.   After you heard these shots, then what occurred?
A. Why, in a second or two Hennicke fell forward right onto
Evan's chest, looked like he was trying to throw him.   And
then they all three kind o' tussled over and fell with their heads
this way."

Bernard then tells of defendant releasing himself from
the officers, and making his escape, and of Hennicke dying in
a few moments, in consequence of the shot he had received
from defendant.   Officer Jones, also had his cheek grazed by
the first shot fired by defendant.   Defendant fled the city.   He
was captured the next morning by special officers, at a station
twenty miles west of Boonville on the Missouri Pacific rail-
road.

Policeman Jones' account of the arrest is the following:

"Then we walked out of the door and on the top step just as we walked out the door, this man Jocko was standing at the door; and I put my hand on him about the same time that Mr. Hennicke did, and I said to him, 'You are just the fellow I am looking for. We want you.'

"Q. Did Mr. Bernard say anything at that time, about that time? A. And Bernard says, 'That is the fellow, that is the fellow.' And Jocko says, 'What do you want to arrest me for? I haven't done anything.' Mr. Hennicke says, 'Never mind about that. We will tell you all about that in the morning.' By this time we were at the railroad. Then we went north along the railroad—

"Q. Well, did you arrest the defendant there? A. We arrested him there, yes, sir.

"Q. And as you went to the railroad he was under arrest and in your custody, was he? A. He was under arrest at the top steps.

"Q. Well, go ahead, Mr. Jones? A. Then we got across to the north side of the street, and we went along there, possibly until we got in front of that gate, or in front of Mr. Preston's grocery store. He had a deck of cards in his hands, and he says to me, 'What will I do with these?' And I just took them—I had hold of his right arm—and I just took hold of the deck of cards and shoved it in my overcoat pocket. By this time we were at that gate, that Jake Deck used to own the property—a man by the name of Bowers lives there now I think. Just as we got along that gate he commenced ramming his hand or trying to get his hand in his hip pocket.

"Q. Which hand? A. His right hand, the one I had hold of. Well, I says to him, 'No, no, you can't do that.' And right there he began to fight and pull and drag, you know, to the corner of the alley.

"Q. And about how far was that from where he first

made his motion to his pocket ?   A. Well, it must be—I will say it is sixteen feet, anyway; may be a little over that. Well, when we got to the alley he kept fighting and pulling, and me holding onto his wrist to keep his hand out of his pocket, until we went up the alley about maybe the same distance—until we struck a picket fence on the west side of the alley.   The picket fence I judge to be about that high; struck me about here (indicating). · Well, I and him when we struck the fence, fell over the fence—that is, didn't fall over completely, but bent way over the fence; and that is where my hold broke on his right hand.

"Q.   Up until that time, you had been holding his right hand ?   A.   Up until that time I had hold of his right hand. And both our hats fell off over the fence, and we both raised up about together, and as we did we were facing one another, and I thought he attempted to strike me with his fist that way (indicating)—only with his right hand—and I threw up my hand that way (illustrating), and his gun went off and just left a little black streak up the side of my face here (indicating), and I could feel the heat of the powder or the flash of the gun against my face.   Well, then, I grabbed him, grabbed under-holds on him, and he twisted in my arms.   That is when he shot the second time.

"Q.   Now in which direction did he shoot that time ? A. Well, he shot—Mr. Hennicke was to my left, and then when we were turned, and to Jocko's right, and then I threw him—

"Q.   Where was Mr. Hennicke, you say, at that time ? A.   Mr. Hennicke was the other side of Jocko.   Jocko was in between him and I.   And he was on the north side and I was on the south side.

"Q.   Well, tell the gentlemen of the jury whether or not the second shot went in the direction of Mr. Hennicke ?   A. The second shot I didn't see no flash—yes, I saw the flash, but

State v. Evans.

it didn't sound loud.  It was kind o' underneath, was low, between us like.  It was a kind of a shot—low—didn't sound loud and clear like the other one did.

"Q.  Well, did it go in the direction of Mr. Hennicke?  A.  Yes, sir; it went in the direction of Mr. Hennicke.  Well, then I throwed this fellow very near across the alley.

"Q.  You mean the defendant, do you?" etc., etc.

Defendant on his part denied he was ever in Bernard's cigar store the night of the homicide.  He also testified that after his captors had taken him about a hundred feet, he stopped and said to them:  "I asked them what they was arresting me for."  Q.  "Who did you ask that?"  A.  "I didn't particularly ask either one of them, I just spoke, says, 'what are you arresting me for.'"  Q.  "Did they tell you?"  A.  "No, sir."  Q.  "What did they do?"  A.  "After I asked them what they were arresting me for, Mr. Jones says, 'Come on here.'  And I stopped and says, 'What are you arresting me for?'  Mr. Jones says, 'Come on here.'  I didn't come here.  I stopped.  As I stopped, Mr. Jones hit me up side the head."  Q.  "What did Mr. Hennicke do?"  A.  "When he hit me up side the head I fell up against the side of him, and Mr. Hennicke pulled out his billy and commenced beating me."  Q.  "Now, go ahead and state what occurred?"  A.  "Then they commenced beating me, then they got me down; and they were beating me, and when I got a show, I got up and fired a shot."  That he shot because he was mad; and that he was mad because Hennicke and Jones were beating him.  He also contradicts Jones and Bernard in other respects.

It is also in evidence that about a month prior to the homicide, Hennicke had arrested defendant for some offense, and while in jail defendant told the matron that Hennicke could never arrest him again alive.

1.  In regard to the jurors, it is sufficient to say that

under the settled rule of this court, it is the established law of this State, and has been ever since State v. Taylor, 134 Mo. 109, that the mere challenging a juror "for cause" will not do, that the cause of challenge must be as distinctly specified as the objection to the introduction to evidence.

2.  Relative to the arrest of defendant: The power of a policeman to make the arrest in question is denied, reliance therefor being based on sections 5784 and 5788, Revised Statutes 1899.  These sections relate to the powers and duties of policemen in cities of the third class, and authorize policemen to arrest without process for offenses committed in their presence against the laws of such city.  But these sections do not in terms impinge upon the authority of policemen at common law, to make arrests for crimes committed against the State. Bishop says: "If a person is walking the streets at night and the indications are that he has committed a felony, watchmen and beadles have authority at the common law to arrest and detain him in prison for examination, though the proof of an actual felony committed may be wanting."  [1 Crim. Proc., sec. 182.]  And he cites among others the case of Lawrence v. Hedger, 3 Taunt. 14, where a watchman arrested a man in the streets of London about ten o'clock at night with a bundle in his hand, as to the contents of which he would not or could not tell, and he was held properly arrested and that no action could be maintained against the watchman.  HEATH, J., observing: "At every Old Bailey session numbers of persons are convicted in consequence of their being stopped by watchmen while they are carrying bundles in this way."  And CHAMBRE, J., said: "In this case, what do you talk of groundless suspicion?  There was abundant ground of suspicion here; we should be very sorry if the law were otherwise."  [See also Whart. Crim. L. (10 Ed.), sec. 415; 1 Russ. on Cr. (9 Am. Ed.), 733; State v. Grant, 79 Mo. loc. cit. 134.]

Hale says: "There are certain officers and ministers of public justice, that *virtute officii* are empowered by law to arrest felons, or those that are suspected of felony, and that before conviction, and also before indictment.

"And these are under a greater protection of the law in execution of this part of their office upon these two accounts. 1. Because they are persons more eminently trusted by the law, as in many other acts incident to their office, so in this. 2. Because they are by law punishable, if they neglect their duty in it.

"And therefore it is all the reason that can be, that they should have the greatest protection and encouragement in the due execution of their office, since their actings herein are not arbitrary, but necessary duties (not permissions), and under severe punishments in their neglect thereof.

"And hence it is, that these officers, that are thus intrusted may without any other warrant but from themselves arrest felons, and those that are probably suspected of felonies; and if they be assaulted and killed in the execution of their office, it is murder; and, on the other side, if persons that are pursued by these officers for felony or the just suspicion thereof, nay for breach of the peace or just suspicion thereof, as night-walkers, persons unduly armed, shall not yield themselves to these officers, but shall either resist or fly before they are apprehended, or being apprehended shall rescue themselves and resist or fly so that they can not be otherwise apprehended, and are upon necessity slain therein, because they can not be otherwise taken, it is no felony in these officers or their assistants, that upon inevitable necessity kill them, though possibly the parties killed are innocent, for by their resistance against the authority of the king in his officers, they draw their own blood upon themselves.

"The officers that I herein principally intend are, 1. Justices of the peace. 2. Sheriffs. 3. Coroners. 4. Constables.

5. Watchmen.    And when I mention these I also include all that come in their aid and assistance; for every man in such cases is bound to be aiding and assisting these officers upon their charge and summons, in preserving the peace and apprehending of malefactors, especially felons." [2 Hale P. C., 85, 86.]

Besides, our statutes have given recognition in at least two instances, that the term *"policeman,"* which is the legal equivalent of "watchman" at common law, are proper persons to make arrest in State crimes. [R. S. 1899, secs. 2468 and 8848.]   Such recognition in legislative enactments is tantamount to legislative authorization in express terms; and this principle is attested by many authorities: Bonds v. State, 17 Am. Dec. 795; Small v. Field, 102 Mo. loc. cit. 119, 120; Bow v. Allenstown, 34 N. H. 351; People v. Perrin, 56 Cal. 345; State v. Cummins, 42 S. W. loc. cit. 881; McCartney v. Railroad, 112 Ill. 611; People v. President, etc., 9 Wend. 351; Society for the Propagation, etc., v. The Town of Pawlet, 4 Pet. 480; Balt. & Potom. R. R. Co. v. Reaney, 42 Md. loc. cit. 131; Inhabitants etc., v. Railroad, 4 Cush. 63; 1 Bishop New Crim. Proc., sec. 181.

A *policeman,* then, has the same power of making arrests for crimes or offenses against the State as has a *sheriff, constable,* etc., and in thus making arrests is covered by the same peculiar protection which the law throws around a sheriff or other like officer.

If a sheriff or other peace officer arrest a person without warrant, he will be justified in doing so although no felony be actually committed; it is sufficient if he have reasonable cause either on his own knowledge of facts, or on facts communicated to him by others, to suspect the one apprehended.    And in thus arresting such suspected felon, or in conveying him to the place of confinement, if the person arrested, or attempted to be arrested, in his endeavor to escape, kill the officer, the crime will

State v. Evans.

be murder; but if the officer necessarily kill him when he resists arrest, or endeavors to escape, the homicide will be altogether justifiable. [State v. Underwood, 75 Mo. 230; 1 Bishop New Crim. Proc., sec. 181, and cases cited, and authorities supra. See, also, 2 Am. and Eng. Ency. of Law (2 Ed.), 870.]

Here Bernard had given the police officers direct and positive information as to the felon and afterwards at the time of the arrest, identified the felon. More than this certainly could not be required.

3. (But it is objected that defendant had no notice of the official character of the officers. This is answered as to Hennicke by the testimony aforesaid of the matron of the jail as to defendant's covert threats against Hennicke, and by the official uniforms worn by both officers at the time of the arrest.

4. But further objection is made that defendant was not notified by the officers for *what* he was arrested. This, however, was not necessary, inasmuch as defendant was apprehended on fresh pursuit; for in such cases notice is not requisite, because the accused is presumed to know for what he is arrested. [1 Whart. Cr. Law (10 Ed.), sec. 418 and cases cited; Lewis v. State, 3 Head. 147; Rex v. Howarth, 1 Mood. C. C. 207; Rex v. Hunt, Ib. 93.]

And it is the rule that notice of the charge and of intention to make the arrest, may be made to appear by some incidental matter. [Gordon's case, 1 East, P. C. 315.]

And it is agreed on all hands that a private person making an arrest for a past felony, need not give notice of the ground for the arrest, if the accused have notice *aliunde*. [State v. Albright, infra.] Here the pursuit was fresh, since not more than twenty or twenty-five minutes elapsed between pursuit begun and apprehension had.

5. But even could the arrest be regarded as one made by

mere private citizens, still, Bernard had knowledge of the crime committed and of the one who committed it, and therefore the killing of him in making the arrest, or of one of his assistants, would also be murder. [State v. Albright, 144 Mo. 638, and cases cited.]

6. Under the authorities cited, even if there had been no felony committed, still, arresting defendant in the circumstances already related, the officers would have been justified in killing defendant, if necessary to overcome his resistance; that is, if he could not otherwise be taken or such resistance overcome; and the killing of Hennicke was nothing less than murder in the first degree; for in such circumstances "passion becomes wickedness and resistance crime." Under these views there was in this cause neither murder in the second degree nor manslaughter.

7. Holding as above, it is only necessary to say that the instructions given (except as to murder in the second degree) were substantially correct, and that those refused defendant were consequently correctly refused.

Therefore, judgment affirmed, and the sentence pronounced ordered to be executed. All concur.