**Rosa CARTER, Administratrix of the Estate of Adrian Miles Carter, deceased, Plaintiff–Appellant, Cross–Appellee,**

v.

**CITY OF CHATTANOOGA, TENNESSEE, Defendant–Appellee, Cross–Appellant.**

Nos. 84–5247, 84–5276.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1987.

Decided June 27, 1988.

---

John W. McClarty (Lead) (argued), McClarty & Williams, Rheubin M. Taylor, Chattanooga, Tenn., for plaintiff-appellant cross-appellee.

Eugene N. Collins, City Atty., Chattanooga, Tenn., Randall L. Nelson (argued), for defendant-appellee cross-appellant.

Before ENGEL, Chief Judge[*], and LIVELY, KEITH, MERRITT, KENNEDY, MARTIN, JONES, KRUPANSKY, WELLFORD, GUY, NELSON, RYAN, BOGGS and NORRIS, Circuit Judges.

WELLFORD, Circuit Judge.

## I. BACKGROUND

Adrian M. Carter was shot and killed by a Chattanooga police officer, Paul Kyle, on December 21, 1982 as he fled from the scene of a burglary. Carter's mother as

---

[*] The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

administratrix brought suit against the officer and the City under 42 U.S.C. § 1983, claiming a violation of the Fourteenth Amendment right of due process of law. At the time, there was in effect in Tennessee a so-called "fleeing felon" statute, TCA 40–808 (1975), recodified in 1982 as TCA 40–7–108.[1] This law had been in effect in Tennessee for many years, and authorized the use of deadly force as a reasonable last resort to apprehend a fleeing felon after notice of intent to arrest. Prior to the trial of the issues in this case, we decided *Garner v. Memphis Police Department*, 710 F.2d 240 (6th Cir.1983), *aff'd sub nom. Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which held that this Tennessee statute, and a City of Memphis policy based thereon, could not constitutionally be applied under the Fourth Amendment to a "seizure," a fatal shooting of a suspect, even if reasonably believed to have committed a felony, under certain circumstances. (The circumstances in *Garner* were that the fleeing suspect who was shot and killed by police was a minor who was neither armed nor otherwise apparently dangerous and who had not, to the knowledge of the pursuing police, been involved in a crime involving serious harm or violence to others.)

Our 1983 decision in *Garner* came about following our remand of the issues to the district court at 600 F.2d 52 (6th Cir.1979).[2] Following *Garner II*, the district court permitted the plaintiff to amend her complaint to assert a Fourth Amendment claim, but it denied plaintiff's motion for a summary judgment on the issue of liability. Both the individual police officer, Kyle, and the City of Chattanooga also moved for summary judgment. Based on his claim of qualified immunity, the district court granted the officer's summary judgment motion, while at the same time denying the City's motion on the grounds that application of *Garner II* precluded this action. At the trial in January of 1984, the district court instructed the jury based on principles set out in *Garner II*, which had been finally decided by this court only a few months before the trial. The jury returned a verdict for the City, and plaintiff has appealed.[3]

Facts in this case are set out based on essentially uncontradicted testimony. There is no dispute but that Adrian Carter and an associate had broken into a Chattanooga residence and were in the process of a burglary when interrupted by the arrival of the uniformed police alerted by activation of a silent burglar alarm. Both Carter and his cohort in crime attempted to escape when they saw the police, and the latter was apprehended at the scene. Carter, however, jumped from a second floor porch to the ground and ignored a call[4] to halt by Kyle, an experienced police officer with more than twenty years of service, who then shot the fleeing Carter. Kyle testified that he noticed that Carter had an object in his hand that Kyle could not identify as Carter ran in a crouched position from the burglary scene.[5] Kyle shot Carter at a distance of some fifteen to twenty yards and made no attempt to chase him while shouting the warning to stop. Kyle had cautioned another officer at the burglary scene not to enter the house at the place where the burglar or burglars had apparently broken in, because he felt it was too dangerous. The jury rendered a verdict for the City.

The plaintiff appealed from the jury verdict for the defendant City and from the district court's refusal to grant a judgment notwithstanding that verdict and/or to grant for a new trial. (No appeal was

---

1. TCA § 40–7–108 provides:

    *Resistance to officer.*—If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest.

2. We refer to the decision reported at 600 F.2d 52 as *Garner I;* the one at 710 F.2d 240 as *Garner II.*

3. A panel of this court considered the appeal and reached a decision reported in 803 F.2d 217 (6th Cir.1987). That decision has been vacated by our decision to hear this case *en banc.*

4. The warnings given by the police were: "Halt, halt, or I'll shoot."

5. The object was later found to be some kind of cloth.

taken from the grant of summary judgment to defendant Kyle.)

The district court in this case declined to grant either of the remaining parties' motions for summary judgment holding that the principles set out in *Garner II* should be retroactively applied and that there were material issues to be submitted to the jury which had been requested by defendant. Judge Milburn, the trial judge, after overruling the parties' motions for a directed verdict, instructed the jury accordingly and the jury returned a verdict for the defendant City. Plaintiff moved in the alternative for a judgment notwithstanding the verdict and/or for a new trial. The district court denied these motions and judgment was entered for the City based upon the sufficiency of evidence to support the verdict and that "reasonable minds" could have reached "different conclusions" on that evidence. Plaintiff now appeals from the entry of judgment for defendant City and the court's refusal to grant her post-verdict motions.

Subsequent to the appeal taken by plaintiff, the Supreme Court affirmed our decision in *Garner II* in a decision reported as *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which held that the Fourth Amendment prohibited the use of deadly force under the circumstances of that case. Use of such force was permissible only if used as a last resort to prevent escape of a suspect, when the police officer had probable cause to believe that he was a felon, gave a warning where feasible, and the suspected felon posed a direct threat of death or serious injury to the officer or to others in the community. The court put it succinctly that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead," but it refused, at the same time, to rule that Tennessee's fleeing felon statute, relied upon here by the City of Chattanooga, was "unconstitutional on its face." 471 U.S. at 11, 105 S.Ct. at 1701.

## II. RETROACTIVITY OF GARNER II

Plaintiff argues that *Tennessee v. Garner* standards properly should have been retroactively applied to this case, and that by reason of such application, she should have been granted either a summary judgment on the question of liability or a judgment notwithstanding the verdict. In considering the issue of whether or not to apply retroactively a decision in a civil case, we look to *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), which enunciated a three part analysis:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." ... Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Id.* at 106–07, 92 S.Ct. at 355 (citations omitted).

These standards enunciated in *Chevron Oil* have been repeatedly reaffirmed and clarified as applying the appropriate principles in civil cases of this kind:

> In the civil context, in contrast, the "clear break" principle has usually been stated as the threshold test for determining whether or not a decision should be applied nonretroactively. See *e.g., Chevron Oil Co. v. Huson*, 404 U.S. 97, 106 [92 S.Ct. 349, 355, 30 L.Ed.2d 296] (1971). Once it has been determined that a decision has "establish[ed] a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not

clearly foreshadowed," the Court has gone on to examine the history, purpose, and effect of the new rule, as well as the inequity that would be imposed by its retroactive application. *Id.,* at 106–107 [92 S.Ct. at 355–56]. See also *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 499 [88 S.Ct. 2224, 2234, 20 L.Ed.2d 1231] (1968).

*United States v. Johnson,* 457 U.S. 537, 550 n. 12, 102 S.Ct. 2579, 2587 n. 12, 73 L.Ed.2d 202 (1982). *See also Goodman v. Lukens Steel Co.,* — U.S. —, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Saint Francis College v. Al–Khazraji,* — U.S. —, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *McSurely v. Hutchison,* 823 F.2d 1002 (6th Cir.1987).

■ The initial hurdle that must be overcome before a court ruling is given nonretroactive effect is a determination of whether the decision marks a "new principle of law, either by overruling clear past precedent on which litigants may have relied ..., or by deciding an issue of first impression whose resolution was not clearly foreshadowed...." *Chevron Oil,* 404 U.S. at 106, 92 S.Ct. at 355.

The Supreme Court has defined more precisely when a "new principle of law" is established, or when a clear break from prior law has come about.

> In general, the Court has not subsequently read a decision to work a "sharp break in the web of the law," ... unless that ruling caused "such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one...." Such a break has been recognized only when a decision explicitly overrules a past precedent of this Court, ... disapproves a practice this Court arguably has sanctioned in prior cases, ... or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved.

*Johnson,* 457 U.S. at 551, 102 S.Ct. at 2588 (citations omitted).

The underlying concern expressed in these cases is the inequity and harshness retroactive application of a new rule of law would impose on parties who had no significant reason to doubt the validity or constitutionality of a statute or practice. A review of the fleeing felon rule's history indicates that *Garner* overturned "a longstanding and widespread practice" the Supreme Court had previously not addressed, "but which a near-unanimous body of lower court authority ha[d] expressly approved." *Id.* at 551, 102 S.Ct. at 2588.

The fleeing felon rule originated early at common law and still constituted the law after nearly two hundred years in this country in approximately one half of the states, including Tennessee at the time *Garner* was decided. *Garner,* 471 U.S. at 16 n. 14–16, 105 S.Ct. at 1702–03. Tennessee was one of nineteen states that had codified the principle. Legislatures in some states had abandoned the rule by opting for the Model Penal Code language or had curtailed the rule by permitting use of deadly force only in certain circumstances. *Id.* at 17 n. 17–18, 105 S.Ct. at 1704 n. 17–18. Significantly, none of the states that had abandoned the common-law rule cited any constitutional basis for their decisions, but concluded as a matter of their own policy that the old rule should be replaced or modified. *See Garner,* 471 U.S. at 15–19, 105 S.Ct. at 1703–05; *see also Sauls v. Hutto,* 304 F.Supp. 124, 131 n. 18 (E.D.La.1969) (quoting Prof. Wechsler's statement of the basis for the Model Penal Code position: "[t]he preservation of life has such moral and ethical standing in our culture and society, that the deliberate sacrifice of life merely for the protection of property ought not to be sanctioned by law" (*quoting from* 1958 American Law Institute Proceedings at pp. 285–86)).

Prior to this court's *Garner II* decision, no court had struck down the fleeing felon rule as unconstitutional as an unreasonable search and seizure under the Fourth Amendment. To the contrary, on three occasions the Tennessee statute was upheld as constitutional by this court or by a

three-judge district court convened to determine the statute's constitutionality.

The first case to examine the Tennessee statute in light of a constitutional challenge was *Cunningham v. Ellington*, 323 F.Supp. 1072 (W.D.Tenn.1971), decided by a three-judge panel consisting of Circuit Judge Harry Phillips, then Chief District Court Judge Bailey Brown, and District Judge Robert McRae. Plaintiffs in *Cunningham* brought a wrongful death action under 42 U.S.C. § 1983 against police officers, the police director, and the mayor and also challenged the constitutionality of the Tennessee fleeing felon statute. The three-judge panel was convened "to hear and determine *only* the question of the facial constitutionality of the involved statute." *Id.* at 1074 (emphasis added). Plaintiffs attacked the statute as violative of the Eighth Amendment's prohibition against cruel and unusual punishment; as unconstitutionally vague and overbroad; as a denial of Sixth Amendment rights to trial by jury, to confrontation of witnesses, and to assistance of counsel; and as a denial of equal protection. That court rejected these numerous constitutional arguments and held that the statute is not "unconstitutional on its face." *Id.* at 1076.

*Cunningham* involved a burglary suspect shot and killed by Memphis police officers "while ... investigating a burglary attempt." *Id.* at 1074. The court set out the principle of law applicable:

> The involved statute, T.C.A. § 40–808, originally enacted in 1858, provides in its entirety as follows:
>
> "40–808. Resistance to officer.—If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest."
>
> It is agreed by all parties that, as construed by the Tennessee courts, this statute means, in the present context, that an officer may use force that may result in death in preventing the escape of a person that he is attempting to arrest if (1) he reasonably believes that the person has committed a felony and (2) he notifies the person that he intends

to arrest him and (3) he reasonably believes that no means less than such force will prevent the escape. The parties also agree that, so construed, the statute merely states the common law. *Reneau v. State*, 70 Tenn. 720 (1879); *Love v. Bass*, 145 Tenn. 522, 238 S.W. 94 (1921); *Scarbrough v. State*, 168 Tenn. 106, 76 S.W.2d 106 (1934); *Johnson v. State*, 173 Tenn. 134, 114 S.W.2d 819 (1938).

*Id.* at 1074–75.

The attorneys involved in *Cunningham* for plaintiff included, among others, Jack Greenberg and Drew Days, III, experienced civil rights advocates. In addressing the numerous contentions of unconstitutionality in the shooting and killing of a burglary suspect, the court recognized that in shooting a fleeing felon, as authorized by the longstanding Tennessee law and common law, a police officer acting on behalf of a municipality was acting at risk if he were deemed by a trier of fact not to have complied with the conditions of the statute earlier specified.

> It is also true that, under this statute, in determining that extreme force can be used, it must reasonably be ascertained that less force will not prevent escape, but this standard of conduct is not so vague as to require an officer to guess as to its meaning. It is true that a great deal of responsibility and authority is placed by the statute in the hands of the arresting officer, but if it is determined later by a trier of the fact that the officer made the wrong decision, he may be subjected to civil and even criminal liability.

323 F.Supp. at 1076.

One year after the court reached its decision in *Cunningham,* this court addressed this issue, concluding significantly:

> This Statute [Tennessee's fleeing felon statute] has been recently construed and found to be constitutional by a Three–Judge District Court. *Cunningham v. Ellington*, 323 F.Supp. 1072 (W.D.Tenn. 1971). *In any event the police officers were entitled to assume the constitutionality of the Tennessee Statute. "State statutes like federal ones are*

*entitled to the presumption of constitutionality until their invalidity is judicially declared."*

*Beech v. Melancon,* 465 F.2d 425, 426 (6th Cir.1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973) (citations omitted) (emphasis added). In a concurring opinion, however, Judge McCree expressed his own reservation about the constitutionality of the rule. Judge McCree did, however, express a belief that the officers' conduct "satisfied constitutional standards in this case." *Id.* at 426.

*Melancon,* once again, involved the shooting of suspects attempting to flee from the scene of a burglary at a Memphis filling station after the suspects ignored warnings by police officers to halt. The same group of attorneys, including Mr. Greenberg and Mr. Days, represented the plaintiff.

Once again this court examined the Tennessee statute in *Wiley v. Memphis Police Department,* 548 F.2d 1247 (6th Cir.), *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed. 2d 78 (1977). In *Wiley* police officers shot and killed a nighttime burglar who tried to flee when the officers caught him in the act of burglary. In reiterating the constitutionality of Tennessee's statute, the panel emphasized that the statute had twice been upheld as constitutional in *Cunningham* and *Beech* and that the statute's "invalidity, or that of a similar statute, up to [the time of the shooting] had never been declared by any Court." *Id.* at 1250–51. Turning its attention to the four-to-three en banc Eighth Circuit decision in *Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir.1976), *vacated as moot sub nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977), which had found the fleeing felon rule violative of substantive due process, the panel strongly criticized the *Mattis* majority:

The Eighth Circuit is the only Court to our knowledge which has ever held that such a statute, which is so necessary even to elementary law enforcement, is unconstitutional. It extends to the felon unwarranted protection, at the expense of the unprotected public.

We agree with the dissent in the Eighth Circuit case (*Mattis v. Schnarr*), which was highly critical of the majority opinion for not following the decisions of other Circuits and for embarking on a new course which should have been left to the state legislatures where it belongs. 548 F.2d at 1252.[6] Concluding that the statute was constitutional, the panel found:

We are of the opinion further that MPD, the City, the Mayor, and the former Mayor, and the Chief of Police had the same right to rely on the law of Tennessee and the decisions of this Court and the decision of the three-Judge Court in formulating their policies. Also, *they could rely on the presumption that the Tennessee statute was constitutional and on the fact that no court at that time had ever held that statute or a similar statute to be unconstitutional.* *Id.* at 1254 (emphasis added).

A Memphis firm that had been involved in *Cunningham* and Mr. Greenberg, among others, represented the *Wiley* plaintiff. *Wiley* was concerned with the flight from an apparent burglary of a store in Memphis and the shooting from a distance of some 200 feet of one of the youthful suspects who ignored repeated commands to halt his flight. Nearby guns were found taken from the store, but the suspect was not armed when shot although we stated in *Wiley* that the officers might have assumed that the suspect was armed. *Id.* at 1253. *Wiley* cited *Qualls v. Parrish,* 534 F.2d 690, 694 (6th Cir.1976), for the following proposition:

6. None of the cases cited, which discussed the § 1983 liability of a police officer or municipality, made reference to the case of *Jenkins v. Averett,* 424 F.2d 1228 (4th Cir.1970). That case considered the shooting of a youthful unarmed black, who "had committed no crime nor was he ever charged with one," 424 F.2d at 1229, and who had been cornered and wounded "accidentally" by defendant officer. *Jenkins* is clearly inapposite, although a divided court made reference to a possible Fourth Amendment violation in the case of an officer guilty of "gross or culpable" conduct, in a situation involving "raw abuse of power" with clear racial overtones. 424 F.2d at 1232.

Our principal reason for agreeing with the district court that the Tennessee rule should be made the federal rule in this case is that a decision to the contrary would be unfair to an officer who relied, in good faith, upon the settled law of his state that relieved him from liability for the particular acts performed in his official capacity. Most of the state courts that have considered this question follow the old common law rule that deadly force may be used by a police officer only when he has reasonable grounds to believe that the person he is attempting to arrest has committed a felony.

548 F.2d at 1253.

*Qualls* noted that most of the states, like Tennessee, followed the "old common law rule" that deadly force might be used by an officer against fleeing felons when "he has reasonable grounds to believe that the person he is attempting to arrest has committed a felony." 534 F.2d at 694 (also noting different positions of ALI Model Penal Code § 3.07 and Restatement I of Torts § 131). *Jones v. Marshall,* 528 F.2d 132 (2d Cir.1975), reached the same result by interpretation of Connecticut law, similar to the common law on apprehension of fleeing felons, to sustain the good faith defense of a police officer as a matter of law in a 42 U.S.C. § 1983 suit brought on behalf of a youthful unarmed offender killed while fleeing after theft of a car. The court came to this conclusion reluctantly because the fleeing suspect was only 16 years old and had not been warned that if he did not halt he might be shot. The *Jones* court stated that it preferred the rule that was later adopted by the Supreme Court in *Garner* but found no constitutional violation in the Connecticut law, similar in effect to the Tennessee fleeing felon rule, stating:

We are today interpreting § 1983, and within that statute the states must be given some leeway in the administration of their systems of justice.... We cannot conclude that the Connecticut rule

[on the arresting officer's use of deadly force] is fundamentally unfair."
*Id.* at 142.

We have traced the history of three § 1983 cases from our circuit during the period from 1971 through 1977 where actions by police officers under color of T.C.A. § 40–7–108 were held to be constitutional in the face of a number of challenges. These suits were handled by able civil rights attorneys who asserted a number of different federal constitutional challenges to the use of deadly force upon fleeing burglary suspects in Tennessee. The factual circumstances in *Cunningham, Melancon,* and *Wiley* were not materially dissimilar from the factual circumstances in *Garner.* Certiorari was denied following our decisions in *Melancon* and *Wiley.* In 1977 we also made it very clear that we did *not* adhere to the reasoning of the Eighth Circuit in *Mattis v. Schnarr,* a case *vacated* by the Supreme Court that same year, and one which we described in *Wiley* as the *only* court to hold that a statute similar to T.C.A. § 40–7–108 might be unconstitutional if applied to an unarmed, apparently nondangerous, fleeing felon.

At about the same time that *Jones v. Marshall* was decided, another circuit court affirmed dismissal of a § 1983 cause of action brought by parents against a police officer and a municipality, charging the defendants with unconstitutional use of deadly force in the fatal shooting of their son while he was attempting to flee from a burglary. *See Wolfer v. Thaler,* 525 F.2d 977 (5th Cir.), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 800 (1977).

As pointed out, *Mattis v. Schnarr,* a majority decision with reasoning contrary to that of the Sixth Circuit, was later vacated by the Supreme Court and had no further precedential effect. In *Wiley,* we expressly adopted the minority view of *Mattis.* [7] Until the 1979 panel decision in *Garner I* then, there was clearly established authority in this circuit, and in almost all

---

**7.** In *Landrum v. Moats,* 576 F.2d 1320 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed. 2d 258 (1978), applying Nebraska fleeing felon law, which was different from the common law in effect in Tennessee and in Missouri, that court reiterated its prior fleeing felon rationale.

other courts that had considered the question, that the ancient fleeing felon rule adopted in Tennessee was constitutional, and that the use of deadly force as a last resort to prevent escape of a fleeing felony suspect was not actionable under § 1983. *Garner I* held that the Memphis police officer was immune from liability based on good faith reliance on Tennessee law, but remanded the case for reconsideration in light of the intervening Supreme Court decision, *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

This court in *Garner I* recognized the longstanding common law principle that the Tennessee statute in controversy embodied. As Professor Wayne R. LeFave acknowledged:

> Under common law, an officer is justified in using reasonable force to make a lawful arrest; this may include deadly force, if reasonably believed necessary, to prevent the escape of a person fleeing from a felony arrest....

> The argument that the common law rule is unconstitutional under the *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), shocks the conscience test has not prevailed.

2 W. LaFave, *Search and Seizure* § 5.1(d) at 238, 239 (1978).

This same rule was set out in respect to pursuit of a remedy against an officer who shot and killed a fleeing moonshiner in *Stinnett v. Virginia*, 55 F.2d 644, 646 (4th Cir.1932):

> As the deceased, according to the testimony of the defense, had unquestionably committed a felony in the presence of the officers, they had the right to arrest him and to use such force as under the circumstances appeared reasonably necessary to effect his arrest or to prevent his escape. And it is a well-settled rule of law that, if the reasonable use of such force results in the death of the felon, the officers may not be held liable therefor. 1 East, 298; Foster's Crown Law 271, 1 Hale P.C. 489; *Ex parte Warner*,

(D.C.) 21 F.(2d) 542; *State v. Garrett*, 60 N.C. 144, 84 Am.Dec. 359; *State v. Roane*, 13 N.C. (2 Dev.) 58; *State v. Evans*, 161 Mo. 95, 61 S.W. 590, 84 Am. St.Rep. 669; 2 R.C.L. 471; 13 R.C.L. 876, note, 17 Ann.Cas. 900.

*Stinnett v. Virginia*, 55 F.2d 644, 646 (4th Cir.1932). *See also Green v. State*, 91 Ark. 510, 121 S.W. 727, 728. To the same effect, see Pearson, *The Right to Kill in Making Arrests*, 28 Mich.L.Rev. 957, 964 (1930); Note, *Justification for the Use of Force in the Criminal Law*, 13 Stanford L.Rev. 566 (1961); R. Perkins & R. Boyce, *Criminal Law* 1098–1102 (3d ed. 1982); and 14 *Crim. L.Bull.* 285 (1978).

It must be frankly acknowledged that there was substantial inconsistency between the holding in *Wiley* in 1977 and the decision in *Garner I* some three years later. *Wiley* involved individual police officers and the same municipal defendants as did *Garner*. It was stated in *Wiley*:

> We are of the opinion further that MPD, the City, the Mayor, and the former Mayor, and the Chief of Police had the same right to rely on the law of Tennessee and the decisions of this Court and the decision of the three-Judge Court in formulating their policies.

548 F.2d at 1254.[8]

Despite this language (and the style of *Wiley*), the panel in *Garner I* indicated that the prior decisions referred to in *Wiley* as determinative of the constitutionality of T.C.A. § 40–7–108 did not establish that law's constitutionality because "those cases dealt with actions against individual officers under § 1983, and not liability based on the 'policy or custom' of a governmental entity." 600 F.2d at 54. Yet it seems clear on reflection that *Wiley* did indeed deal with, and discuss, formulation and carrying out of Memphis Police Department policy based on the aforesaid Tennessee statute and the common law, then in force in a majority of states. A judge, in analyzing this apparent inconsistency after considering *Wiley* and other decisions to the same effect in this circuit and *Garner I*, stated

8. MPD refers to the Memphis Police Department; the "City" to Memphis. The three-judge court decision was *Cunningham v. Ellington, supra.*

that "other panels of the Court might prefer a different result," but concluded that "it is impossible to conclude that the Sixth Circuit has not spoken on the issue of the constitutionality of the fleeing felon rule." *Truss v. Collier*, 574 F.Supp. 1249, 1260 (S.D.Ohio 1983) (J. Rice). In *Truss*, although the district judge indicated that he preferred a different result, the court decided that the City of Springfield, Ohio, and an individual police officer, sued under § 1983 based on claimed constitutional violations, were not liable for use of deadly force on a fleeing burglary suspect. The Ohio city and its officers, like Memphis and its officers, followed a common law rule, although Ohio's rule had not been codified.

Another student of the then clearly existing status of the law *prior* to *Garner II* reached the same conclusion that Judge Rice reached in *Truss v. Collier. See* Note, *The Unconstitutional Use of Deadly Force Against Nonviolent Fleeing Felons: Garner v. Memphis Police Department*, 18 Ga.L.Rev. 137, 144 n. 30 (1983). The dissenting opinion in *Mattis v. Schnarr*, 547 F.2d 1007 (8th Cir.1974) (en banc) (4–3 decision), which was adopted as stating the correct view of the law by this court in *Wiley*, 548 F.2d at 1252, observed:

> Indeed, prior to this decision, no court has held that the modification of a statute of this sort falls within the judicial purview delimited by the separation of powers contained in our Constitution.
>
> ... On the other hand, the majority does not cite, nor can I find, any state where the common law rule on the use of deadly force, either codified or uncodified, has been invalidated by either a state or federal court. Those courts faced with attacks on the common law rule allowing all force reasonably necessary to effect the arrest of fleeing or resisting felons have consistently held that these attacks present policy questions for the legislature, not the judiciary. *Jones v. Marshall*, 528 F.2d 132 (2d Cir.1975); *Cunningham v. Ellington*, 323 F.Supp. 1072 (W.D.Tenn.1971) (three-judge court); *Hilton v. State*, 348 A.2d 242 (Me.1975); *Shumann v.*

*McGinn*, [307 Minn. 446], 240 N.W.2d 525 (Minn.1976).

547 F.2d at 1021–22 (Gibson, C.J., Stephenson, J., and Henley, J., dissenting).

On remand from this court in *Garner I*, the district judge relied specifically on *Cunningham*, which had not been distinguished in *Garner I*, holding that the City of Memphis and its police department were not liable, and responded to the questions posed by the *Garner I* panel. (C–75–145, opinions, 2/29/80 and 7/8/81, W.D.Tenn.).

The question posed for remand in *Garner I* did not serve as notice to cities such as Chattanooga that the fleeing felon rule was constitutionally infirm. The question put on remand was: "[I]s a municipality's use of deadly force under Tennessee law to capture allegedly nondangerous felons fleeing from nonviolent crimes constitutionally permissible under the fourth, sixth, eighth and fourteenth amendments?" 600 F.2d at 55 (footnote omitted). *Garner I* did not discuss precedential decisions indicating that the rule was not constitutional; the court merely inserted a footnote citing various cases including the Second and Eighth Circuit cases previously discussed. Additionally, the panel noted two law journal articles, one of which raised the Fourth Amendment as a possible basis for striking down the common law rule. *Id.* n. 2, 3; *see* Comment, *Deadly Force to Arrest: Triggering Constitutional Review*, 11 Harv. C.R.–C.L.L.Rev. 361 (1976). In light of all the cases reaching an opposite conclusion on the constitutionality of the fleeing felon rule, and particularly in light of prior authority in this circuit, *Garner I*'s formulation of the question on remand surely cannot be viewed as a foreshadowing of the rule's demise. To the contrary, *Garner I* gave the cities and their police departments no reasoned basis to conclude that prior decisions of this court that the Tennessee fleeing felon statute was constitutional were destined to be overruled.

This conclusion is supported by two law review articles appearing after the Supreme Court decided *Tennessee v. Garner*. These articles determined after detailed research that the constitutional analysis in

*Garner* was both novel and a clear break from past precedent:

> The Supreme Court's affirmance in *Garner* represents an unexpected, but nonetheless logical, extension of existing fourth amendment jurisprudence. The decision was *unexpected* both because the Burger Court has generally curtailed the scope of fourth amendment protections and because *the federal and state courts have been almost unanimous in upholding similar deadly force rules. The case also charted new territory* because the Court had never before held the means of arrest unreasonable when the officer had probable cause to believe the suspect had committed a crime. In addition, the Court for the first time explicitly recognized that the fourth amendment protects an individual's interest in life as well as her interests in property and privacy.

*The Supreme Court—Leading Cases*, 99 Harv.L.Rev. 120, 248 (1985) (emphasis added) (footnotes omitted). Similarly, a comment in the *University of Cincinnati Law Review* described *Garner II* as a "bold and pioneering step" and noted that prior to the 1983 Sixth Circuit ruling, "[e]xcept for one decision that was later vacated by the Supreme Court ... the federal courts consistently had declined to hold that the application of the fleeing felon doctrine resulted in unconstitutional deprivations." Comment, *Tennessee Code Section 40–7–108 Authorizing the Use of Deadly Force by Police Officers Against an Unarmed Suspect of a Nonviolent Felony Is Unconstitutional under The Fourth and Fourteenth Amendments—Garner v. Memphis Police Department*, 710 F.2d 240 (6th Cir.1983), 52 U.Cin.L.Rev. 1154, 1159, 1167 (1983).

A main purpose of *Garner*, one of obvious and important value, was to deter conduct of municipalities in the use of deadly force under circumstances where the fleeing felon was reasonably believed to present no threat to the arresting officer or to the community. Another purpose, of course, was to provide compensation to victims who could prove that they posed no threat and who could establish that they were proximately caused injury by reason of the carrying out of a municipal policy which violated their constitutional rights. The two-prong and proper effect of the *Garner* decision, then, is to deter municipal officials and to provide compensation to victims in appropriate cases by prospective application of the new principles enunciated by the Supreme Court.

■ We conclude, therefore, that the first standard enunciated in *Chevron Oil* was satisfied. *Garner II*, as affirmed in *Tennessee v. Garner*, established a new and unexpected principle of law by setting aside clearly established precedent, particularly in this circuit, on which the City of Chattanooga and its police officers had a right to rely when this most unfortunate episode occurred in 1982. If it did not overrule a clearly established precedent in the Supreme Court, *Tennessee v. Garner* decided "an issue of first impression whose resolution was not clearly foreshadowed." 404 U.S. at 106, 92 S.Ct. at 355.[9]

Next we must consider whether retroactive application of *Garner* would further or retard the operation of the Court's ruling. We make this determination " 'by looking to the prior history of the rule in question [and] its purpose and effect....' " *Chevron Oil*, 404 U.S. at 107, 92 S.Ct. at 355 (*quoting Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965)).

**9.** The dissent in *Tennessee v. Garner* emphasized that the Court had effectively created a new Fourth Amendment right, and cited the contrary policy consideration in *Wiley,* in which certiorari had been denied in 1977. The dissent also observed critically that the majority had decided to be unconstitutional for the first time a practice which "predates enactment of the Bill of Rights and continues to be accepted by a substantial number of the States," and cited *Cunningham v. Ellington,* 471 U.S. at 28, 30, 105 S.Ct. at 1710, 1711. It is interesting that the majority opinion in *Tennessee v. Garner* cited none of the Sixth Circuit authority discussed herein or *Cunningham;* rather, it made reference to *Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir.1976), which it had vacated in 1977. 471 U.S. at 19, 105 S.Ct. at 1705; see also 471 U.S. at 18 n. 21, 105 S.Ct. at 1705 n. 21, which referred to the *Mattis* dissent.

Proof of improper use of deadly force may result in compensation to the decedent's estate, but this result is merely a consequence of applying the *Garner* rule. An award of damages against a police officer or a city may encourage future compliance with the rule, but its deterrent effect by retroactive application is highly questionable. Modifying one's behavior to comply with a future change of a rule, particularly an unforeseeable change, is difficult if not impossible. Retroactive application of *Garner* would, therefore, have little, if any, effect of furthering the deterrent goal of *Garner*.

■ We find that the second part of the *Chevron Oil* analysis is, at best (from the plaintiff's standpoint) inconclusive. There was no reasonable basis under the law or precedential authority at the time for Chattanooga officials to doubt the constitutionality of the fleeing felon rule in Tennessee. The law in effect did not permit use of deadly force unless reasonably necessary as a matter of last resort to prevent the escape of a suspected felon after a warning. The officer's conduct was subject to a reasonableness standard. The primary reason for imposing § 1983 liability on a municipality is deterrence. *Owen v. City of Independence*, 445 U.S. 622, 651–52, 100 S.Ct. 1398, 1415–16, 63 L.Ed.2d 673 (1980). The remand in *Garner I* was ordered in light of *Monell*. Ultimately, in *Tennessee v. Garner*, the Tennessee statute, and by inference the policy it represents, was not found to be facially unconstitutional, but was "invalid insofar as it purported to give Hymon [the Memphis Police Officer who shot Garner] the authority to act as he did." 471 U.S. 11, 22, 105 S.Ct. at 1701–07. We see little that would further the purpose of deterrence by applying the *Garner* rule retroactively under the circumstances. *Garner II* clearly had prospective effect. *See Robinson v. Bibb*, 840 F.2d 349 (6th Cir.1988).

Weighing and balancing of the equities in this case in light of the "prior history of the rule in question" (the fleeing felon rule), and "its purpose and effect," we are persuaded that the City of Chattanooga did have a legitimate basis at the time to believe that its policy, in conformity with Tennessee law and longstanding common law, was not unconstitutional. *See Chevron Oil*, 404 U.S. at 106, 92 S.Ct. at 355. The second standard of *Chevron Oil*, then, was met, and it is appropriate to apply the new principle of *Garner II* and *Tennessee v. Garner* prospectively. The conduct and policy in question in *Garner* and in the instant case were not found by our court or by the Supreme Court to be conduct that shocks the conscience as in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); rather they were described as "constitutionally *unreasonable.*" 471 U.S. at 11, 105 S.Ct. at 1701 (emphasis added). The Court noted further that if "there is probable cause to believe that he [the felony suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape...." 471 U.S. at 11, 105 S.Ct. at 1701. The direction of change of policy in *Garner* was, therefore, not a change to preclude infliction of deadly force on a fleeing felony suspect, but rather to require application of a further reasonableness standard: probable cause to believe that the suspect was a threat to the officer or may have threatened serious harm to others. Prospective rather than retroactive application of that refinement, we believe, would not retard the operation of that new constitutional policy.

Under the third standard of *Chevron Oil* for determining whether to apply a principle or decision retroactively in the civil liability context, we must "weigh the inequity imposed by retroactive application." 404 U.S. 107, 92 S.Ct. at 355. In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court decided whether the single act of a responsible municipal official might constitute a policy decision within the meaning of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). It held that such action by a municipal "policymaker" may subject the county to § 1983 liability "under appropriate circumstances." 475 U.S.

at 480, 106 S.Ct. at 1298. In *Pembaur*, however, it was noted that not "every act of municipal officers with final authority to effect or authorize arrests and searches represents the policy of the municipality." *Id.* at 486, 106 S.Ct. at 1301 (White, J., concurring). Liability was based in *Pembaur* upon retroactive application of *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), and the defendant *did not challenge* and was deemed to have "conceded" the retroactivity of *Steagald. See* 475 U.S. at 487–88, 106 S.Ct. at 1302–03. Justice Powell, dissenting in *Pembaur*, did discuss the retroactivity question:

> [R]etroactive application ... in this context would produce substantial inequitable results by imposing liability on local government units for law enforcement practices that were legitimate at the time they were undertaken. See *Griffin v. Illinois*, 351 U.S. 12, 26, 76 S.Ct. 585, 594, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring in the judgment) ("We should not indulge in the fiction that the law now announced has always been the law ..."). Civil liability should not attach unless there was notice that a constitutional right was at risk. *Procunier v. Navarette*, 434 U.S. 555, 562 [98 S.Ct. 855, 859, 55 L.Ed.2d 24] (1978).

*Pembaur*, 475 U.S. at 494–95, 106 S.Ct. at 1306 (Powell, J., dissenting (joined by Burger, C.J., and Rehnquist, J.)).

■ The jury in this case heard all the evidence, was given instructions which were favorable to plaintiff in applying *Garner II* retroactively, and ruled in favor of the defendant City. It may fairly be said that often the jury generally reflects the conscience of the community, and thus the verdict here may reflect a kind of equitable value judgment. Cities such as Chattanooga are faced with serious risks and burdens in carrying out their police powers under the general Tennessee law and the long established common law as to capture of fleeing felons. The City ought not be deterred in its exercise of what it has good reason to believe is constitutional conduct in the face of repeated and unsuccessful court challenges to the policy it pursued. This was more than merely exercising good faith; it was acting in reliance on what appeared over many years to have been valid and proper state directed police conduct and policy. The burden upon the defendant municipality and others in similar positions if we were to decide that the equities weighed in favor of plaintiff, who had not even raised a fourth amendment claim at the time *Garner II* was decided, would be substantial. A state or city having notice that a given and settled or legal principle will henceforth be considered unenforceable or violative of newly decided federal constitutional principles may have an opportunity in the future to protect itself against liability by changing its policies thereafter. To impose liability against the City in the present situation would be inequitable and might present severe financial strain in the case of smaller municipalities.

That reasoning applies with equal force in this case because the City of Chattanooga was justified in relying on the apparently established constitutionality of the Tennessee fleeing felon rule under Sixth Circuit rulings, a three-judge district court decision in the circuit, and the nearly unanimous judicial approval of the common law rule. To change the rule retroactively to the detriment of defendants and potentially hundreds of other municipalities that would be adversely affected by such a ruling would be unfair.

■ There can no longer be support for the view, expressed in *Smith v. General Motors Corp.*, 747 F.2d 372 (6th Cir.1984) (en banc), that merely because a decision which may establish an entirely new precedent was applied in the case under consideration that it should, *ipso facto*, therefore become controlling automatically and retroactively to all like situations which may have arisen before that decision. That rationale flies in the face of *Chevron Oil*, which has consistently been followed in the consideration and application of standards heretofore discussed. See *Thomas v. Shipka*, 829 F.2d 570, 571 n. 1 (6th Cir.1987), wherein we stated:

In *Smith* we developed a rule for determining the retroactivity of Supreme Court decisions predicated upon whether the Supreme Court had applied its decision to the case before it. If it did, we concluded that the Supreme Court was demonstrating its intent that its decision should be applied retroactively. However, the Supreme Court's decision in *St. Francis College* [*St. Francis College v. Al–Khazraji,* —— U.S. ——, 107 S.Ct. 2022, 93 L.Ed.2d 21 (1987) ], as well as its decision in *Goodman* [*Goodman v. Lukens Steel Co.,* —— U.S. ——, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) ], clearly make the rationale of *Smith* suspect. We conclude that *Smith* can no longer be the law of this circuit in light of the more recent Supreme Court pronouncements.

*Shipka* involved a careful study and consideration of *Chevron Oil* standards in deciding whether a recently adopted principle in a decision of this court should be applied retroactively to other civil cases. The first factor in *Chevron Oil,* whether there had been "a departure from clear precedent" was considered in *Shipka* to be "most important" and "also inextricably interrelated with the third factor in the *Chevron* analysis which focuses on the equitable considerations involved ... [and which] is in large part dependent upon the outcome of the analysis under the first part of the test." 829 F.2d at 573, 574. We also considered and applied *Chevron Oil* standards and factors in considering retroactivity of *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), in the recent case of *McSurely v. Hutchison,* 823 F.2d 1002 (6th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1107, 99 L.Ed.2d 269.

The cases cited in *Thomas v. Shipka, supra,* from the Supreme Court were decided after *Smith v. General Motors, su-*

*pra,* and each discussed in some detail the applicability of *Chevron Oil Co. v. Huson, supra.* The first of these cases, *St. Francis College v. Al–Khazraji,* —— U.S. ——, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), stated:

> But *Chevron Oil Co. v. Huson, supra,* counsels against retroactive application of statute of limitations decisions in certain circumstances. There, the Court held that its decision specifying the applicable state statute of limitations should be applied only prospectively because it overruled clearly established circuit precedent on which the complaining party was entitled to rely, because retroactive application would be inconsistent with the purpose of the underlying substantive statute, and because such application would be manifestly inequitable. The Court of Appeals found these same factors were present in this case and foreclosed retroactive application of its decision in *Goodman.* We perceive no good reason for not applying *Chevron* where *Wilson* has required a Court of Appeals to overrule its prior cases. Nor has petitioner persuaded us that there was any error in the application of *Chevron* in the circumstances existing in this case.

107 S.Ct. at 2025–26.

Following the rationale above expressed, the Court affirmed the Third Circuit and did not apply the "usual rule" that the case should be decided in accordance with the law existing at the time of decision. The Court noted that its decision in *Wilson v. Garcia* required the appellate court to overrule its prior cases; in the controversy at hand, *Garner* effectively overrules prior Sixth Circuit cases, *Cunningham, Melancon, Wiley,* and *Qualls.*[10] This of course,

---

10. *Haislah v. Walton,* 676 F.2d 208 (6th Cir. 1982), decided April, 1982, involved recapturing a fleeing *misdemeanant,* not a fleeing felon, and the use of deadly force under Ohio law in that circumstance. Judge Edwards, a member of the *Garner* panels, in *Haislah* referred to *Garner I* and also to *Wiley, Qualls,* and *Melancon* (not *Cunningham,* but also surprisingly to *Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir.1976), repudiated by this court in *Wiley* ). See also the dissent of Judge Weick in *Hayes v. Memphis Police*

*Department,* 571 F.2d 357 (6th Cir.1978), *aff'd after remand,* 634 F.2d 350 (6th Cir.1980). *Haislah* held that it was improper to interject the "fleeing felon" rule through a misleading jury instruction. No issue about the constitutionality of the "fleeing felon" statute of Ohio, much less that of Tennessee, was before this court in *Haislah,* in which there was also a strong dissent. No party in *Haislah* argued that Ohio law justified deadly force to capture one suspected

is a different situation from a change in the law made by the Supreme Court while a case is pending on direct appeal from the district court to the court of appeals (as happened in *Garner I* where *Monell v. Dept. of Social Services, supra,* changed the law on municipal liability while *Garner* was on direct appeal). *See United States v. Schooner Peggy,* 1 Cranch 103, 110, 2 L.Ed. 49 (1801).

Again, the second Supreme Court case relied upon in *Thomas v. Shipka, supra,* to hold *Smith* no longer to be controlling on this point, was *Goodman v. Lukens Steel Co.,* — U.S. ——, 107 S.Ct. 2617, 96 L.Ed. 2d 572 (1987). The Court reiterated the rule expressed in *St. Francis College:*

> The usual rule is that federal cases should be decided in accordance with the law existing at the time of decision.... But *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), advises that nonretroactivity is appropriate in certain defined circumstances. There the Court held that a decision specifying the applicable state statute of limitations in another context should not be applied retroactively because the decision overruled clear Circuit precedent on which the complaining party was entitled to rely, because the new limitations period had been occasioned by a change in the substantive law the purpose of which would not be served by retroactivity, and because retroactive application would be inequitable.

107 S.Ct. at 2621 (citations omitted).

The *Goodman* Court approved retroactivity of its *Wilson* decision because "when the complaint was filed ... there was no established precedent." *Id.* at 2622. Again, in the instant controversy, when

Carter filed her complaint precedent was clear in this circuit that constitutional challenges to Tennessee's fleeing felon were uniformly unavailing. In footnote 8 in *Goodman,* the Court referred to *Smith v. Pittsburgh,* 764 F.2d 188 (3d Cir.), *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985), where the court applied the three-prong *Chevron Oil* standard to decide whether a ruling should be applied retroactively, holding:

> ... where application of the law had been erratic and inconsistent, without clear precedent on which plaintiff [or litigant] could reasonably rely ... a subsequent Supreme Court decision on the applicable limitations period cannot be said to have overruled clear past precedent on which the litigants may have relied.

*Smith,* 764 F.2d at 194–95.

In light of these recent Supreme Court cases, we expressly adopt the reasoning of *Thomas v. Shipka* to the effect that the holding of *Smith v. General Motors* is no longer valid. Accordingly, we have applied the test for nonretroactivity established in *Chevron Oil* to *Garner,* and we have concluded that there was clear and consistent precedent in this circuit upholding the constitutionality of the Tennessee fleeing felon statute prior to *Garner II.*[11]

Judge Merritt argues in his dissent that *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), narrows the *Chevron* standards for considering retroactivity. One searches in vain, however, for any citation or reference to *Chevron* in the lengthy majority opinion in *Owen* or to any discussion of standards of retroactivity. Simply put, *Owen* decided, counter to what the dissent asserted was the Court's prior precedent, that a munici-

---

merely of being a misdemeanant. *Haislah* was not cited in *Garner II,* but it was noted in *Truss v. Collier,* 574 F.Supp. 1249 (S.D. Ohio 1983), as indicating no change in Sixth Circuit law prior to *Garner II.* It has not been cited in any other fleeing felon case to our knowledge. In fact, after the issue was first decided in *Cunningham,* no case prior to *Garner* in this circuit indicated that the constitutionality of the Tennessee fleeing felon statute was in doubt.

11. There was an entirely different circumstance in the Eleventh Circuit relating to the Alabama fleeing felon statute where there was no prior clear precedent as to its constitutionality. See *Acoff v. Abston,* 762 F.2d 1543 (11th Cir.1985), and *Pruitt v. City of Montgomery,* 771 F.2d 1475 (11th Cir.1985). Neither of these Eleventh Circuit cases cited the Sixth Circuit and other authority herein discussed and relied upon; instead both cited *Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir.1976), expressly rejected by this court and vacated by the Supreme Court.

pality may not claim the kind of immunity based on good faith that its officers or agents may claim. Owen was terminated by the city council as police chief allegedly without proper notice or an opportunity to be heard, and he filed a § 1983 action against the city, the city manager, and council members in their official capacities. The case had an interesting procedural history, but after an initial court of appeals' determination to reverse, at least in part, the district court's judgment for the defendant city, it was remanded (as in *Garner*) for further consideration in light of the intervening Supreme Court decision in *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Upon remand, the court of appeals denied any relief against the city "because its officials acted in good faith and without malice." 589 F.2d 335, 338 (8th Cir.1978). The Supreme Court reversed, discussing in detail the effect of *Monell*, which had overruled the doctrine of *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which held municipalities not liable under § 1983.

It is important to note that the defense of the city and the council in *Owen* was not that it had not "twice refused petitioner's request that he be given written specification of the charges against him and an opportunity to clear his name," but rather that its agents had acted in good faith since Owen, they maintained, had no claim which involved a constitutional property or liberty interest. 445 U.S. at 634 n. 13, 100 S.Ct. at 1406 n. 13. The real defense in *Owen* was not whether the alleged unconstitutional acts of denial of due process had occurred, or whether the alleged violation was the proximate cause of damages, but rather whether under the circumstances a municipality's defense of good faith immunity could be claimed. The situation as to Carter is different; the City of Chattanooga claims no constitutional violation because the officer had probable cause to act, and because its policy of adhering to the Tennessee law was not the proximate cause of any constitutional injury to Carter. *Owen*, like *Garner*, did apply a "new" constitutional interpretation to the facts before it,

but there was no discussion of retroactivity or of *Chevron* standards.

We cannot agree, therefore, that *Owen* narrows and confines the *Chevron* standards dealing with retroactivity of a case involving, as did *Garner*, a new legal principle which overruled clear past precedent and a long history of common law, and/or decided an issue of first impression. *Owen* simply put municipalities on notice that they could be held liable, unlike individuals acting under color of law, for policies which proximately caused constitutional injury despite the municipality's contention that it acted in good faith. Contrary to Judge Merritt's assertion, our decision in this case does not "adopt a uniform rule that all judicial decisions apply prospectively only." It reiterates instead the rationale and effect of *Chevron*, which has been repeatedly cited with approval since it was announced some seventeen years ago.

We have concluded that *Garner* (*Garner II* and *Tennessee v. Garner*) constituted a departure from clearly established prior precedent or law. We believe that it logically follows that it would bring about a "substantial inequitable" result to apply *Garner*'s new principle retroactively to the City of Chattanooga.

We are here considering the retroactivity of a prior decision in a civil case context, not in application to a criminal case involving constitutional rights of other similarly situated criminal defendants. The general rule, even in the criminal case context, about retroactive application of a "clear break with the past" rule was set out in *United States v. Johnson*, 457 U.S. 537, 549–50, 102 S.Ct. 2579, 2586–87, 73 L.Ed.2d 202 (1982):

> [W]here the Court has expressly declared a rule of criminal procedure to be "a clear break with the past," *Desist v. United States*, 394 U.S. [244] at 248, [89 S.Ct. 1030, 1033, 22 L.Ed.2d 248], it almost invariably has gone on to find such a newly minted principle nonretroactive. See *United States v. Peltier*, 422 U.S. 531, 547, n. 5 [95 S.Ct. 2313, 2322, n. 5, 45 L.Ed.2d 374] (1975) (Brennan, J., dissenting) (collecting cases). In this ... type

of case, the traits of the particular constitutional rule have been less critical than the Court's express threshold determination that the " 'new' constitutional interpretatio[n] ... so change[s] the law that prospectivity is arguably the proper course," *Williams v. United States*, 401 U.S. [646,] at 659 [91 S.Ct. 1148, 1156, 28 L.Ed.2d 388] [ (1971) ] (plurality opinion). Once the Court has found that the new rule was unanticipated, the second and third *Stovall* factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rule—have virtually compelled a finding of nonretroactivity. See, *e.g.*, *Gosa v. Mayden*, 413 U.S. [665], at 672–673, 682–685 [93 S.Ct. 2926, 2932–33, 2937–38, 37 L.Ed.2d 873 (1973) ] (plurality opinion); *Michigan v. Payne*, 412 U.S. [47], at 55–57, [93 S.Ct. 1966, 1970–71, 36 L.Ed.2d 736 (1973) ].

A deeply divided Supreme Court was concerned in *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), about this "clear break rule" when "only one of many similarly situated defendants receives the benefit of the new rule" in a criminal case context, particularly when there was evidence of unconstitutional racial discrimination or racial exclusion in jury selection which may have tainted an entire criminal proceeding and resulting conviction of black defendants whose cases were pending on direct review. In that situation, the court held that *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was to be applied retroactively to those cases pending on direct review.

It is clear that *Griffith* does not overrule *Chevron Oil*, nor should it, by implication, be applied in a civil case context.

We noted in *Johnson* that our review did not address the area of civil retroactivity. See 457 U.S. at 563, 102 S.Ct. at 2594. *That area continues to be governed by the standard announced in*

*Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971).

107 S.Ct. at 713 n. 8 (emphasis added).

We are chastised by Judge Merritt in his dissent for not acknowledging a number of cases that allegedly "have applied *Garner* retroactively." (*infra*, p. 1143 of Merritt Opinion). We address those cases but note, as he concedes, that these "courts did not expressly analyze whether *Garner* should have retroactive effect." Indeed, none of them (except one from the Eleventh Circuit) [12] refers to *Chevron* (or to any asserted *Owen v. City of Independence* restriction upon *Chevron* ), nor do they make any retroactivity analysis about the effect of *Garner* on the use of deadly force by police as authorized by the common law and/or by a law such as that of Tennessee in the case of use of such force as a reasonable last resort to capture a fleeing felon. Some of these cases do not apply to a municipal defendant such as the City of Chattanooga.

First, we refer to *Fernandez v. Leonard*, 784 F.2d 1209 (1st Cir.1986). That case involved the shooting by an FBI agent of a kidnap victim in an attempt to capture the kidnappers. The court reversed a grant of summary judgment to the FBI agent based on immunity claims. Of course, the City of Chattanooga may claim no immunity since *Owen*. The *Fernandez* case is not really applicable here because the court described the individual defendant's actions as "so excessive and brutal that it 'shocks the conscience' " under the rationale of *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). 784 F.2d at 1216. "There was no need for the application of *any* force by the defendant" according to *Fernandez*. *Id.* It held generally that by 1976 it was a violation of due process rights and of unlawful seizure rights for government officials to employ such use of excessive, deliberate, and unnecessary force to bring about the death of an innocent victim. The court did note that "...

---

**12.** That case, *Pruitt v. City of Montgomery*, 771 F.2d 1475 (11th Cir.1985), is referred to and

distinguished at n. 11.

*Garner* decides a *novel question* of law...." *Id.* at 1217 n. 3 (emphasis added).

*Kidd v. O'Neil,* 774 F.2d 1252 (4th Cir. 1985), *overruled on other grounds by Justice v. Dennis,* 834 F.2d 380 (4th Cir.1987), involved a case of claimed police brutality in beating a prisoner while in custody. The dismissal of the pro se plaintiff's case was reversed, because the court held that brutality and excessive use of force upon a prisoner involved a Fourth Amendment claim, and that there was "confirmed long-standing authority to the same effect in this circuit." *Id.* at 1255. We see little, if any, applicability of the reference to *Garner* in *Kidd* to the situation in the instant case.

*Griffin v. Hilke,* 804 F.2d 1052 (8th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987). In this § 1983 case, there was no consideration or discussion of municipal liability, and the court did not discuss the individual defendant's qualified immunity claim. The defendant's motion for a new trial was ordered because it was held to be error for plaintiff's counsel to have argued to the jury that the government was financially responsible for the individual officer's actions.

*Ryder v. City of Topeka,* 814 F.2d 1412 (10th Cir.1987). Plaintiff sued in respect to a 1979 episode in which she was shot by a pursuing police officer after a suspected Pizza Hut robbery. The court affirmed jury verdicts for the defendant police officer and city despite the fact that plaintiff was a 14 year old female who was discovered to be unarmed after being shot as she fled the crime scene. The *Ryder* court acknowledged some disagreement with *Pruitt v. City of Montgomery, supra,* in its interpretation of *Garner.* The *Ryder* court found constitutionally permissible "[i]n limited circumstances, ... the use of deadly force to apprehend a fleeing felon." 814 F.2d at 1417. It observed further:

> There might be numerous situations that would justify a police officer's belief that a suspect was armed and that he posed an immediate threat to the officer, even though the suspect was not in fact arm-

ed.... [W]e conclude that whether a particular seizure is reasonable is dependent on the "totality of the circumstances" and not simply on whether the suspect was armed.

*Id.* at 1419 n. 16 (citation omitted).

*Jamieson v. Shaw,* 772 F.2d 1205 (5th Cir.1985). This case involved a minor passenger injured in an automobile when the police set up a roadblock to stop the driver, an allegedly known mental patient, who had committed a *traffic offense.* (There was a serious doubt in *Jamieson* as to whether the driver was a fleeing felon in any event, and the two passengers with him were innocent parties as the police knew. *See id.* at 1207.) A vigorous dissent took issue with the majority's reversal of the dismissal of the claim. *Jamieson* held that under the circumstances asserted, the Fourth Amendment indicates that a "seizure" must be reasonable and that a roadblock may constitute a seizure. There was no discussion about whether this was actually a "fleeing felon" situation.

*Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984). This 75 page opinion makes one footnote reference to *Garner. Id.* at 1278. Under Wisconsin law the city was held liable to indemnify defendants, white police officials, held liable by a jury as conspirators for being involved in a grossly negligent and unnecessary racially motivated killing of a black man who was a fleeing misdemeanant, and for an attempt over many years to cover up the true facts of the killing. The issue in *Garner* was found to be "to some extent related" to the issues involved in *Bell.* We see no real relationship of *Garner* to the *Bell* situation, and we see no relationship between the unlawful and unnecessary use of deadly force upon a fleeing unarmed, and known to be unarmed, misdemeanant whose tail light was out, as was the case in *Bell,* and the circumstances in the instant case. Municipal liability in *Bell* was based on indemnity principles only, and not on any municipal policy or practice.

We have not previously cited or relied upon these cases cited by Judge Merritt in his dissent because they do not discuss or

consider the issues which are here involved concerning municipal liability under § 1983 or whether, under *Chevron* principles, the Supreme Court's *Garner* decision should be retrospectively applied. We do not believe they are authority which deals with the kind of *Chevron* analysis which Judge Merritt himself seems to concede is warranted in this case.

In summary, in applying the *Chevron Oil* analysis in this case, we conclude that *Garner II* and *Tennessee v. Garner* should not have been retroactively applied to the City of Chattanooga. On that basis, the defendant City would be entitled to judgment as a matter of law. The district court instructed the jury regarding the principles articulated in *Garner II, aff'd sub nom. Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and the jury returned a verdict for the City. The trial judge was, however, in error in submitting the issues in this case to the jury on the basis of retroactive application of *Garner* for the reasons heretofore stated. He should have granted judgment as a matter of law to the City because it was not at the time following a clearly established unlawful or unconstitutional policy. Accordingly, we reverse the judgment of the district court on the issue of retroactivity and grant judgment for the City on its cross-appeal.

While we affirm a judgment for the defendant City of Chattanooga, for the reasons stated, we hold that the district court was in error in instructing the jury by retroactive application of the principles set out in *Garner II*, which had been decided only a short time before. Carter, in effect, received more favorable consideration than she was entitled to, but the jury, nevertheless, returned a verdict for defendant. We hold that the district court's analysis of the pre-*Garner II* law in this circuit on December 21, 1982, the date of the fatal shooting of Carter, was correct in its January 27, 1984 memorandum [13] and that he should have granted the City's motion for summary judgment or the City's motion for direct-

ed proof at the conclusion of all the evidence. (It is interesting to note that plaintiff had not even presented a fourth amendment claim at the time *Garner II* was decided.) The district court, however, was correct in overruling plaintiff's motion for a new trial and for judgment notwithstanding the verdict. In short, it was not error to enter a judgment for the defendant City based upon the proof and evidence in this case and upon nonretroactive application of *Garner II*. The City, at the critical time was not following a clearly established unlawful, or unconstitutional policy. We accordingly affirm the entry of judgment for the City but for the reasons herein set out, not for the reasons expressed by the district court.

We have reached the same result as did the district court, judgment for the defendant City of Chattanooga, but on different grounds. Even if *Garner II* and *Tennessee v. Garner* were deemed to be properly retroactively applied, however, there is a strong argument that may be made for the affirmance of the jury verdict. In light of the full discussion herein and our determination that the *Garner* rule should not have been retroactively applied to the City of Chattanooga, we find no reason to consider or rule upon that issue.

We AFFIRM the judgment for the City of Chattanooga for the reasons stated.

MERRITT, Circuit Judge, dissenting.

*Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and our *Garner II* opinion which the Supreme Court affirmed, 710 F.2d 240 (6th Cir.1983), limit the authority of the police to shoot to kill. By holding that this fundamental principle of the *Garner* opinions applies only prospectively, the majority's opinion demonstrates a fundamental misunderstanding of the principle of retroactivity and creates an unnecessary conflict in the circuits on an important constitutional issue. The majority basically looks only to

---

**13.** This memorandum cited *Cunningham, Beech, Qualls,* and *Wiley* with the latter's criti-

cism of *Mattis v. Schnarr, supra,* noted.

*Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), and then gives it an erroneous interpretation. This view reveals a lack of understanding of the general principle that judicial decisions have retroactive effect. *See Goodman v. Lukens Steel Co.*, — U.S. —, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987). The majority ignores the "usual rule" that federal cases are decided "in accordance with the law existing at the time of decision." *Id.; see also Saint Francis College v. Al–Khazraji*, — U.S. —, 107 S.Ct. 2022, 2025, 95 L.Ed.2d 582 (1987); *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 486 n. 16, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784 (1981); *Thorpe v. Housing Authority*, 393 U.S. 268, 281, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969); *United States v. The Schooner Peggy*, 1 Cranch 103, 109, 2 L.Ed. 49 (1801).

For hundreds of years the common law applied the current rule of law to pending cases, and thereby established a strong presumption that all judicial decisions apply retroactively.[1] This presumption grew out of the view that judges were not creators but discoverers of the law. *Linkletter v. Walker*, 381 U.S. 618, 622, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601 (1965). As Blackstone explained, judges were "not delegated to pronounce a new law, but to maintain and expound the old one." 1 W. Blackstone, *Commentaries* 69 (1765). A new ruling did not mean that a contrary old rule was "*bad law*, but that it was *not* law." *Commentaries* at 70 (emphasis in original). Chief Justice Marshall made the same point:

> [I]f, subsequent to the judgment [in the trial court] and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, ... the court must decide according to existing laws, and if it be necessary to set aside a judgment ... which cannot be affirmed, but in violation of law, the judgment must be set aside.

*The Schooner Peggy*, 1 Cranch at 110. To the same effect, Justice Holmes:

> I know of no authority in this court to say that in general state decisions shall make law only for the future. Judicial decisions have had retrospective operation for near a thousand years.

*Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 372, 30 S.Ct. 140, 148, 54 L.Ed. 228 (1910) (dissenting). And Chief Justice Rehnquist:

> The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student.

*United States v. Security Industrial Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 629 (1982).

The majority opinion presents a distorted picture both of the decisional evolution of the Supreme Court ruling in *Garner* and of the legal standard that must be met to justify the exceptional step of applying a judicially determined rule of law nonretroactively. Specifically, the majority opinion:

(1) mischaracterizes the relationship between the Sixth Circuit and Supreme Court decisions in *Garner* and the earlier "fleeing felon" precedents;

(2) fails to recognize that under *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the narrow exceptions permitted by *Chevron* must be narrowed further in a case involving a municipal defendant and a constitutional issue, thus providing additional reason to apply *Garner* retroactively;

(3) misstates the principal purposes that underlie the litigation of constitutional torts under § 1983 and exaggerates the "hardship" that might result from requiring municipal governments to be sensitive to developing constitutional trends; and

(4) creates a conflict with the rule of retroactivity adopted, either expressly or implicitly, and applied by seven other circuits. It also ignores the inequity that results when similarly situated victims of constitutional deprivations are treated differently due to inconsistent and unprincipled application of nonretroactivity.

---

1. *See* J. Gray, *The Nature and Sources of the Law* 218–24 (2d ed. 1921); M. Hale, *History of the Common Law* 141 (5th ed. 1794); Note, *Prospective Overruling and Retroactive Application in the Federal Courts*, 71 Yale L.J. 907 (1962).

## I.

The majority's first task is to establish that the defendant in this case—now only the City of Chattanooga—should have relied on the validity of the Tennessee statute permitting the use of deadly force to apprehend unarmed, nonviolent felony suspects. This reliance factor, as described by *Chevron*, requires that:

> [T]he decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants have relied, *see, e.g., Hanover Shoe v. United Shoe Machinery Corp.*, [392 U.S. 481] at 496, [88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231] or by deciding an issue of first impression whose resolution was not clearly foreshadowed, *see, e.g., Allen v. State Board of Elections*, [393 U.S. 544] at 572, [89 S.Ct. 817, 835, 22 L.Ed.2d 1].

404 U.S. at 106, 92 S.Ct. at 355. The majority's explanation of how this language applies to the *Garner* principle suffers from two critically important defects.

\* \* \* \* \* \*

First, *Garner* did not overrule a clear past precedent, either in the Supreme Court or the Court of Appeals, on which the City of Chattanooga reasonably could have relied. Because officer Kyle shot Adrian Carter on December 21, 1982, we examine prior case law established as of that date in order to determine if the City relied on a clear past precedent to justify its use of deadly force. On December 21, 1982, there was no Supreme Court opinion on the subject, and the following six cases relating to Tennessee's fleeing felon statute had been decided by federal courts: *Cunningham v. Ellington*, 323 F.Supp. 1072 (W.D. Tenn.1971); *Beech v. Melancon*, 465 F.2d 425 (6th Cir.1972), *cert. denied*, 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973); *Qualls v. Parrish*, 534 F.2d 690 (6th Cir. 1976); *Wiley v. Memphis Police Dept.*, 548 F.2d 1247 (6th Cir.), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); *Garner I*, 600 F.2d 52 (6th Cir.1979); *Haislah v. Walton*, 676 F.2d 208 (6th Cir.1982).

An examination of these cases reveals that no past precedent had established that Tennessee's fleeing felon statute was constitutional on the basis of the Fourth Amendment. And two of these cases clearly indicated that the constitutionality of the statute was an open question.

*Cunningham, Beech, Qualls* and *Wiley* each discussed Tennessee's fleeing felon statute, but none of these cases focused on the issue of *Garner:* whether such police conduct may violate the Fourth Amendment. As our 1983 panel opinion in *Garner II* said, the "question under the Fourth Amendment is one of first impression in this Court." 710 F.2d at 243. *See Cunningham*, 323 F.Supp. at 1075–76 (statute not unconstitutional on its face under Eighth and Fourteenth Amendments); *Beech*, 465 F.2d at 426 (relying on *Cunningham*, statute not unconstitutional; Fourth Amendment not discussed); *Qualls*, 534 F.2d at 694 (police officer justified to believe deadly force necessary; no constitutional issue discussed). *Wiley* is the only case in which the Fourth Amendment was even mentioned, and then only as one of six separate constitutional theories involved on a *jurisdictional* basis. 548 F.2d at 1248. The *Wiley* opinion, however, contained no discussion of the Fourth Amendment claim and relied only on *Cunningham* and *Beech*, both due process holdings. Because it was decided before *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *Wiley* did not address municipal liability and held only that the individual officers were entitled to good faith immunity because they "had a right to *assume* that the statute was constitutional." *Id.* at 1251 (emphasis added). *Wiley* did not hold that the Tennessee statute passed Fourth Amendment muster.

The majority attempts to justify its assertion that *Garner I* contained no "warning signal" by a long and detailed recital of the failure of Judge Wellford, then sitting as a district judge, to discern that signal upon remand in *Garner I.* Two other district judges, however, did not find the message of *Garner I* so difficult to understand. *See, e.g., Taylor v. Collins*, 574 F.Supp. 1554, 1558 (E.D.Mich.1983) (*Garner I* foretold Sixth Circuit's decision in

*Garner II*); *Jacobs v. City of Wichita,* 531 F.Supp. 129, 132 (D.Kan.1982) (after *Garner I,* the Sixth Circuit no longer "reads its prior opinions as based on ... the constitutionality of the common law rule"). In *Taylor,* in which the District Court concluded that "retroactive application of *Garner II* is appropriate," 574 F.Supp. at 1559, Judge Newblatt explained that a law review comment cited in *Garner I* "reveals that the historical foundation of American state fleeing-felon statutes is a foundation built on loose sand." *Id.* at 1558. Judge Newblatt concluded that after *Garner I,* "the *Garner II* Fourth Amendment ruling ... was no shock." *Id.* It seems to me that the plain meaning of the Court's language in *Garner I* clearly signaled in 1979 to various cities, including Chattanooga, that Tennessee's statute as applied to unarmed, nonviolent felony suspects, might violate the Fourth Amendment. Moreover, if there were any doubt about the meaning of *Garner I,* the Sixth Circuit *repeated the warning* again in an opinion published *eight months before* Carter was shot in Chattanooga. *See Haislah v. Walton,* 676 F.2d 208 (April 21, 1982).

In *Haislah,* another case involving a fleeing suspect, the Sixth Circuit reversed a jury decision for the city and a police officer in part because the district court's instructions misleadingly "implied that the absence of [police officer] Walton's liability meant that ... no constitutional violation has been committed." 676 F.2d at 214 n. 3. The court explained:

> When the asserted justification is the apprehension of a fleeing felon, however, the exoneration of the police officer does not necessarily settle the constitutionality of his conduct or the liability of his governmental employer. *See Garner [I],* 600 F.2d 52, 54–55 (6th Cir.1979).

*Id.*

Could it have been plainer that the Sixth Circuit viewed the constitutionality of the fleeing felon statutes as in some doubt?

Thus, there was no "clear past precedent" in *Cunningham, Beech, Qualls,* and *Wiley,* none of which involved the Fourth Amendment, and each of which centered on the issue of good faith immunity for the individual officer. And the majority's disregard of the clear signal in *Garner I,* a signal repeated again in *Haislah,* reveals how result-oriented the majority's mission here is.

For years many have considered the type of police killings condoned here morally wrong and constitutionally suspect. The majority is wrong that *Garner* created a "novel" rule. Almost twenty years ago former Chief Justice Warren Burger said in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 419, 91 S.Ct. 1999, 2016, 29 L.Ed.2d 619 (1971), "that a 'shoot' order might conceivably be tolerable to prevent the escape of a convicted killer but surely not for car thieves, pickpockets or a shoplifter." And as we noted in *Garner II,* 710 F.2d at 246, the Sixth Circuit more than 100 years ago said that an officer cannot legally kill an unarmed, nonviolent, fleeing suspect:

> Suppose, for example, a person were arrested for petit larceny, which is a felony at the common law, might an officer under any circumstances be justified in killing him? I think not. The punishment is altogether too disproportionate to the magnitude of the offense.

*United States v. Clark,* 31 F. 710, 713 (1887).

Moreover, the majority ignores the Supreme Court's historical summary in *Tennessee v. Garner* that "the long-term movement has been away from the rule that deadly force may be used against any fleeing felon." 471 U.S. at 18, 105 S.Ct. at 1705. The Court reviewed studies reporting that "only 7.5% of departmental and municipal policies explicitly permit the use of deadly force against any felon; 86.8% explicitly do not." *Id.* at 19, 105 S.Ct. at 1705. The Court noted that the Model Penal Code rejected the old common law rule. The Court concluded that, in view of the more enlightened policies adopted by the police themselves, "the older and fading common-law view is a dubious indicium" of the continuing constitutionality of the Tennessee statute. *Id.*

The majority gives scant attention to two recent Eleventh Circuit cases in which separate unanimous panels explicitly ruled that under *Chevron, Garner* should apply retroactively. *Acoff v. Abston,* 762 F.2d 1543, 1548–49 (11th Cir.1985); *Pruitt v. City of Montgomery,* 771 F.2d 1475, 1478–83 (11th Cir.1985); *see* Maj. opin. at 1133 n. 11, 1135 n. 12. In *Acoff,* Judge Johnson explained:

> We hold that the *Garner* decision was not an entirely new and unanticipated principle of law that would justify nonretroactivity. The decision, while not a simple application of past precedent, did follow the "balancing" methodology of many recent Supreme Court opinions.... There was no prior precedent overruled by *Garner.* Nor does the decision apply to any longstanding and widespread practice which the Supreme Court had sanctioned in prior cases or ignored while lower courts had approved of the practice with near unanimity. Indeed, several courts had expressed the view that certain uses of deadly force such as the one in question here violate the Constitution.

762 F.2d at 1549 (citations omitted).

In two recent Supreme Court cases, *Goodman v. Lukens Steel Co.,* —— U.S. ——, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), and *Saint Francis College v. Al–Khazraji,* —— U.S. ——, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), the Court provided a vivid illustration of the importance of "clear past precedent" in the retroactivity determination under *Chevron.* In *Saint Francis,* the Court upheld the nonretroactive application of *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), because when plaintiff filed his suit, it was clearly established in the Third Circuit that a § 1981 plaintiff must comply with a six year statute of limitations. 107 S.Ct. at 2025–26. In *Goodman,* however, the Supreme Court ruled that because there was no clear past precedent relating to the statute of limitations on which a plaintiff could rely, *Wilson v. Garcia* should apply retroactively. 107 S.Ct. at 2621–22.

The two cases involved the application of a statute of limitations for the same cause of action, 42 U.S.C. § 1981, in the same (Third) Circuit. The difference between the two cases was that the plaintiff in *St. Francis* filed his lawsuit after two Third Circuit cases had expressly held that the six year limitation applied. The *Goodman* plaintiff's suit was filed *before* those two cases, at a time when there was no "established precedent in the Third Circuit," the law was "unsettled," and thus a decision "should be given the customary retroactive effect." *Goodman,* 107 S.Ct. at 2622. Thus, the *Wilson v. Garcia* Supreme Court holding was applied retroactively in the same circuit to a case filed in 1973 but not to a case filed in 1980. The difference obviously was not time, but precedent and the strength of the reliance interest at stake.

In *Garner,* we are dealing not with a question of which state statute of limitations should apply, a narrow, specific question of federal common law, but rather with a broad constitutional question under the Fourth Amendment which had not been conclusively decided in the Supreme Court or elsewhere. *See Bradley v. Richmond School Board,* 416 U.S. 696, 719, 94 S.Ct. 2006, 2020, 40 L.Ed.2d 476 (1974).

Moreover, the reliance question here is how the Supreme Court's decision in *Garner,* not this Court's decision, should be applied. It is a strange constitutional principle of retroactivity that prohibits police shootings in Alabama but permits them in Tennessee. Nothing in this circuit's line of cases creates the kind of strong reliance interest that might justify such an anomalous result.

\*     \*     \*     \*     \*     \*

The second major flaw in the majority's analysis of *Chevron*'s reliance factor is its failure to understand the narrowing effect that *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), must have on nonretroactivity in cases of municipal liability. In *Owen,* the City had discharged the plaintiff two months before the Supreme Court had issued its opinions in two cases that served

to establish the *Owen* plaintiff's right to a hearing. The district court had held that the City could not be "reasonably ... charged with constructive notice of such rights." *Id.* at 631 n. 10, 100 S.Ct. at 1405 n. 10. But the Supreme Court flatly rejected the City's argument that it

> could not have been aware of [petitioner's] right to a name-clearing hearing in connection with the discharge [and] should not be charged with predicting the future course of constitutional law.

*Id.* at 634, 100 S.Ct. at 1407.[2] The Court held that "municipalities have no immunity from damages liability flowing from their constitutional violations." *Id.* at 657, 100 S.Ct. at 1418. And, the Court explained:

> [E]ven where some constitutional development *could not have been foreseen* by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights, *albeit newly recognized,* have been violated.

*Id.* at 655, 100 S.Ct. at 1417 (emphasis added).

Finally, the Court announced that it wanted to "create an incentive for officials who *may harbor doubts* about the lawfulness of their intended actions to *err on the side* of protecting citizens' constitutional rights." *Id.* at 651–52, 100 S.Ct. at 1416 (emphasis added).

The *Chevron* analysis must be carried out in the clear light of *Owen.* Although *Owen* is about qualified immunity and *Chevron* is about nonretroactivity, both are squarely focused on the issue of *reliance* that is common and crucial to both doctrines. Surely when we analyze whether to apply a new basis for constitutional liability nonretroactively, we should not exempt a city from liability under *Chevron* if that same city should be liable under the express holding of *Owen.*

Neither do I think that the phrase "an issue of first impression whose resolution was not clearly foreshadowed," *Chevron,* 404 U.S. at 106, 92 S.Ct. at 355, should be applicable to this type of § 1983 case, involving a constitutional issue and a city defendant. Even apart from the narrowing effect of *Owen,* the mere fact that a case is one of first impression whose result has not clearly been foreshadowed ordinarily does not, by itself, suffice to trigger nonretroactivity. The few Supreme Court cases of this "first impression" type all contained other compelling reasons to bar retroactive application, *see Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (new rule applied prospectively to avoid substantial injustice and hardship against thousands of litigants who relied on jurisdiction of bankruptcy courts); *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed. 2d 647 (1968) (substantial inequity and hardships would result if elections voided; decision applies prospectively); *Allen v. State Board of Elections,* 393 U.S. 544, 571–72, 89 S.Ct. 817, 834–35, 22 L.Ed.2d 1 (1968) (elections not voided; new rule applies prospectively). In each of these cases, the Supreme Court applied new judicial decisions nonretroactively to avoid substantial hardship, inequitable results, or massive disruption. Here, retroactive application of *Garner* hardly approaches the impact of disrupting thousands of bankruptcy decisions or voiding elections already held.

Therefore, the fact that the *Garner* Fourth Amendment holding was one of "first impression" is of no moment to the *Chevron* reliance analysis. The only inquiry necessary is whether the city relied on a clear past precedent. If the reliance was not based on a clear past precedent, the city's reliance was not justified and therefore the new rule must apply retroactively.

In this case, there existed no precedent holding that the fleeing felon statute complied with the Fourth Amendment, and two

---

**2.** Like Chattanooga, the City of Independence in *Owen* relied on prior case law which did not establish a clear precedent that the city's actions violated a constitutional right. *See* 445 U.S. at 633 n. 13, 634, 100 S.Ct. at 1406 n. 13, 1407.

Sixth Circuit cases had declared the law in this area unsettled. Likewise, the law of the nation as a whole was not settled. The Supreme Court had never spoken on the question. Chattanooga certainly should have harbored some doubt about the constitutionality of its fleeing felon policy, and could not have reasonably relied on existing law to justify its authorization of deadly force.

## II.

The majority's cryptic discussion of *Chevron*'s second factor is also troublesome. Under *Chevron* the court must:

> weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its application.

404 U.S. at 106–07, 92 S.Ct. at 355. The majority not only distorts *Garner*'s effect on deterring cities from unconstitutional policies, it also virtually ignores *Garner*'s remedial purpose of providing compensation.

In the majority's view, the primary purpose of *Garner*—a purpose the majority obviously considers of dubious value—is to deter cities from certain policies sanctioning deadly force in violation of the Fourth Amendment. Because it is too late to deter past policies or conduct, the majority concludes we should not apply *Garner* retroactively. The opinion states:

> Modifying one's behavior to comply with a future change of a rule, particularly an unforeseeable change, is difficult if not impossible. Retroactive application of *Garner* would, therefore, have little, if any, effect of furthering the deterrent goal of *Garner*.

Maj. opin. at 1130.

By claiming that the purpose of *Garner* is to deter the city from violating only those legal standards that are already crystal clear, the majority has erected a "stand pat" approach that is flatly contrary to the stated purpose of the Civil Rights Act and once again flatly contrary to the holding of the Supreme Court in *Owen v. City of Independence*. It is true that one cannot deter the performance of an illegal act already committed. But the logical outcome of the majority's approach would be the adoption of a uniform rule that virtually all judicial decisions apply prospectively only. Under this approach, the Supreme Court should not have applied the new *Garner* rule to *Garner* itself, and except in "easy" cases no court would apply its instant holding to the instant facts. The majority's error is demonstrably fundamental, and as Justice Holmes pointed out in the *Kuhn* case, 215 U.S. at 372, 30 S.Ct. at 148, contrary to "near a thousand years" of Anglo–American jurisprudence.

The majority's view that deterrence must be limited to only *foreseeable* changes in the law has a superficial appeal, reminding one of the concepts of duty and proximate cause in tort law. But the Supreme Court rejected this formulation, as discussed at length above, in *Owen*. Cities are to be held liable for, and thus be deterred from, violations even when the constitutional rights in question are "newly recognized" and the result of "some constitutional development [which] *could not have been foreseen* by municipal officials." 445 U.S. at 655, 100 S.Ct. at 1417 (emphasis added).

The Supreme Court in *Owen* also recognized that § 1983 actions have *two* main purposes, not only to deter against future constitutional deprivations, but also "to provide compensation to the victims of past abuses," 445 U.S. at 651, 100 S.Ct. at 1416 (citing *Carey v. Piphus*, 435 U.S. 247, 256–57, 98 S.Ct. 1042, 1048–49, 55 L.Ed.2d 252 (1978); *Robertson v. Wegmann*, 436 U.S. 584, 590–91, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978)). The majority virtually ignores *Garner*'s effect on a suspect's constitutional rights and only grudgingly acknowledges that victims of such violations are entitled to receive compensation. Retroactive application of *Garner* would make Chattanooga understand the seriousness of violating a suspect's Fourth Amendment rights through deadly police force.

The majority makes the remarkable assertion that compensation of victims of constitutional deprivations is "merely a consequence" of a § 1983 judgment applying the

*Garner* principle. Maj. opin. at 1130. It omits the actual language from *Owen* describing the essential purposes of § 1983 actions:

> A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.

445 U.S. at 651, 100 S.Ct. at 1415. The Court also explained:

> The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an *incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights. Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights.* Such procedures are particularly beneficial in preventing those "systemic" injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith.

*Id.* at 651–52, 100 S.Ct. at 1416 (footnotes omitted) (emphasis added); *see also* Mishkin, *Foreword: The High Court, the Great Writ, and the Due Process of Time and Law,* 79 Harv.L.Rev. 56, 72 (1965).

The majority also does not appreciate that recovery of damages is essentially the *only* means of enforcing the *Garner* rule. In most other cases in which the constitutional deprivation is a matter of criminal procedure, enforcement is primarily guaranteed by operation of the exclusionary rule, *see Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1979); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed.

436 (1948). In *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1959), the Supreme Court explained that the exclusionary rule

> is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

But in situations like *Garner,* usually no tangible evidence or statements are retrieved as a result of the constitutional violation. Thus, the usual threat of the exclusionary rule does not help guarantee compliance with the Supreme Court's rule that deadly force violates an unarmed, nonviolent felony suspect's Fourth Amendment rights. Without an enforcement mechanism, the Court has no effective means of requiring compliance with constitutional decisions. In *Garner* cases, then, the remaining enforcement mechanism is the threat of an action for damages under § 1983 against cities with policies sanctioning the use of deadly force against unarmed, nonviolent felony suspects.

### III.

Finally, *Chevron* requires a court to weigh:

> the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce *substantial inequitable results* if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Cipriano v. City of Houma,* [395 U.S.] at 706.

404 U.S. at 107, 92 S.Ct. at 355 (emphasis added). As already discussed above, applying the *Garner* rule retroactively does not at all implicate the types of hardship or disruption that sometimes have sufficed to justify nonretroactivity.

In considering equity and consistency in the application of the law, we note that the Supreme Court applied the *Garner* rule in the *Garner* case. The shooting of Edward Garner occurred October 3, 1974; the shooting of Adrian Carter occurred December 21, 1982. More difficult to conceive than anything else said by my colleagues in

the majority is their statement that "weighing and balancing of the equities in this case," Maj. opin. at 1130, requires denying recovery to the mother of this dead boy who, though unarmed and on the run was shot in the back in violation of the Fourth Amendment of the Constitution of the United States. There is nothing in any of the opinions in *Garner* quite so "novel" as that.

It is striking that no less than seven other circuits have applied *Garner* retroactively. *Fernandez v. Leonard*, 784 F.2d 1209, 1217 (1st Cir.1986) (under *Garner*, police officer violated suspect's Fourth Amendment rights on December 27, 1976); *Kidd v. O'Neil*, 774 F.2d 1252, 1255–56 (4th Cir.1985) (under *Garner*, summary judgment reversed where police used excessive force against suspect on April 15, 1983); *Griffin v. Hilke*, 804 F.2d 1052, 1055 (8th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3185, 96 L.Ed.2d 673 (1987) (*Garner* applies to § 1983 action where suspect shot on February 18, 1978); *Ryder v. City of Topeka*, 814 F.2d 1412, 1417–18 (10th Cir. 1987) (*Garner* applies to suit where fleeing suspect shot by police on March 25, 1979); *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1478–79 (11th Cir.1985) (*Garner* applies to § 1983 action where plaintiff shot by police on September 1, 1982); *see also Jamieson v. Shaw*, 772 F.2d 1205, 1209–10 (5th Cir.1985) (District Court should have permitted plaintiff suspect to amend complaint with Fourth Amendment claim under *Garner* for injury on July 25, 1982); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1278 n. 87 (7th Cir.1984) (*Garner II* applies to § 1983 action where fleeing suspect shot by police on February 2, 1958). In these cases, courts did not expressly analyze whether *Garner* should have retroactive effect. They assumed it. Despite the majority's lengthy attempt to distinguish the facts of these cases from *Garner* and *Carter*, it does not—and cannot—deny that these courts did indeed apply the *Garner* holding to these earlier incidents.

The Supreme Court's decision on the Tennessee statute at issue in *Garner* had obvious implications for the 18 other states which also retained codifications of the old common law fleeing felon rule. On issues of "great national concern," the presumption of retroactivity must be applied with more force than usual. *Bradley v. Richmond School Board*, 416 U.S. 696, 719, 94 S.Ct. 2006, 2020, 40 L.Ed.2d 476 (1974) (applying liability for attorney fees in desegregation case retroactively against municipal school board). Across the country many other past victims of excessive police force are being recompensed, and the city defendants are not even arguing the issue of *Garner*'s retroactivity. As explained *supra*, pp. 1141, the Eleventh Circuit in *Acoff v. Abston*, 762 F.2d 1543, 1548–49 (11th Cir.1985), fully analyzed whether *Garner* should apply retroactively and concluded that it should.[3]

Basically, what has happened in this *en banc* case is that the majority—in its hostility to the liberalization of the law by the Supreme Court and in its zeal to show that the panel decisions of this Court in *Garner I* and *Garner II* were wrong—has forgotten that the question before us concerns the retroactivity of the *Supreme Court*'s opinion in *Garner*. No other court has agreed with the majority, and every sensi-

---

**3.** In *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Supreme Court ruled that new criminal procedural rules automatically apply retroactively to pending cases on direct appeal. *Griffith* may provide some support for the view that *Garner* should automatically apply retroactively because the duty to respect suspects' *Garner* rights arises from a Fourth Amendment principle which finds its most common application in criminal procedure. Consistency may require that *Griffith* apply to civil cases, such as this one, arising out of criminal episodes. The extent of the applicability of *Griffith* in the civil context is an open question, and there are difficult counterarguments. For example, in the criminal area, the *Griffith* rule of automatic retroactivity applies only to cases on direct review. *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), continues to hold that a new rule of criminal procedure is applied retroactively on collateral review in habeas corpus cases only if it has "a fundamental impact on the integrity of factfinding." *Id.* at 2878. Thus the question of *Griffith*'s applicability remains unresolved; in light of our discussion above, we need not address it further.

ble argument leads to the opposite conclusion.

In conclusion, the holding in *Garner* should have been applied retroactively as a matter of law to the facts of this case. The District Judge did so when he ruled as a matter of law that the Chattanooga policy was unconstitutional and when he charged the jury that Kyle was acting in conformity with municipal policy. However, his instructions to the jurors allowed them to engage in a redetermination of the "constitutionality" or "unconstitutionality" of the City's policy insofar as it treated all burglars as potentially dangerous. App. 140–51, 191. The jurors' verdict for the City probably resulted from a decision that the City's policy was constitutional, but it may have resulted from a conclusion that Kyle had the requisite probable cause to shoot. If the former, the verdict was contrary to law. If the latter, it was a verdict that no reasonable jury could have reached, given the testimony of Officer Kyle that he shot Carter solely because he was a fleeing burglar. App. 77–78, 103–04. The District Court should have granted plaintiff's motion for judgment notwithstanding the verdict.

BOYCE F. MARTIN, Jr., dissenting.

I am profoundly troubled by the majority's willingness to embark upon a difficult journey of legal reasoning that travels upon one-way unilluminated passageways and which reaches a destination, I believe, that affords unequal justice in the vindication of constitutional rights. I join, therefore, the dissent of Judge Merritt.